Lewis Russ, Trustee, Appellant, B. S. Russ, Trustee, Substitute Plaintiff, v. Thomas J. Hansen, Albert Kopesky and The Iowa Loan & Trust Company, and Lewis Russ, Trustee, Appellant, B. S. Russ, Trustee, Substitute Plaintiff, v. Silas R. Thompson, Albert Kopesky and The Iowa Loan & Trust Company.

Agency: RATIFICATION: FRAUD. Where an agent is authorized
1    to loan and collect money for his principal and to receive payments on the sale of his land, and after forging and recording deeds to land belonging to his principal by which he acquires the apparent title, he fraudulently sells and conveys the same as his own and remits to his principal money received from that sale without disclosing to him the source from which it is received; *held*, that if the principal, on learning the facts, fails to return the money to the purchaser, he ratifies the sale and is bound by the agent's fraudulent act.

Same: EVIDENCE OF PRINCIPAL'S KNOWLEDGE: NOTICE. This ac-
2    tion is to cancel fraudulent conveyances and to quiet title, and upon the evidence; *held*, that the principal had sufficient knowledge to constitute notice that the money received from his agent was derived from a fraudulent sale of his land, and in retaining the same he ratified the fraudulent sale.

*Appeal from Kossuth District Court.*—Hon. A. D. Bailie, Judge.

Monday, February 2, 1903.

Action to cancel conveyances and quiet title to land. Hansen and Thompson, defendants first named in the two cases, respectively, made default, and a decree was entered in favor of Albert Kopesky and the Iowa Loan & Trust Company in each case. Plaintiff appeals.—*Affirmed.*

*Clark & Cohenour* for appellant.

*E. A. Morling, F. M. Curtiss* and *Vincel Drahos* for appellee Kopesky.

*Dudley & Coffin* and *Sullivan & McMahon* for appellee Iowa Loan & Trust Company.

McClain, J.—It is not necessary to explain the nature of the claims of plaintiff Lewis Russ, as trustee, to the property in controversy. Prior to the transactions hereafter referred to, it belonged to his son L. D. Russ, who, though a man of middle age, was residing with his father in Chicago, as a member of his family, such ownership being subject only to the conditions of a trust deed to plaintiff, which conditions need not here be described. Since the action was brought, B. S. Russ has been substituted as trustee. The interests of the Russes are identical, and L. D. Russ will be treated as plaintiff. .

The property in controversy consists of three distinct quarters of a section of farm land in Kossuth county, and, while there are particular facts as to the title of each quarter which must be hereafter noticed, the ultimate questions involved as to the three are exactly the same. For about seven years prior to the transactions with reference to this land hereinafter to be referred to, one C. L. Lund, residing at Algona, in Kossuth county, had been the agent of plaintiff, first for the sale of lands, and afterwards for the collection of money due as principal and interest on land contracts, and, further, for the investment of the money so received, and other money sent to him by plaintiff, in chattel mortgage loans, and to some extent in the purchase, keeping, and sale of cattle. It may be said, however, at once, that the evidence tends to show the chattel mortgage loans by Lund for plaintiff to have been largely fraudulent; that is, Lund would report loans made out of moneys collected by him or remitted to him for the purpose, and furnish forged chattel mortgages purporting to represent such loans, when in fact no such loans had been made, and, when the mortgages were sent back to him in order that the money called for might be collected, he would charge himself with the amount as having been paid, and credit himself with reinvestment, furnishing

other forged instruments as evidence thereof.    In July, 1896, Lund died; and the testimony of L. D. Russ and Lewis Russ is to the effect that up to that time they had the most implicit confidence in the integrity and capacity of Lund, but that afterwards they discovered that he had, by means of these fictitious chattel mortgages, defrauded plaintiff of over $100,000.

The question as to the extent of Lund's authority as agent in the sale of plaintiff's land is, however, the material one in the present controversy; and with reference to that the testimony shows that Lund had full authority to negotiate with reference to sales, either on contract or by direct conveyance, fixing the prices and terms of payment, but that the contracts or deeds were submitted to L. D. Russ for the signature of Lewis Russ as trustee, and, when returned to Lund, were by him delivered to the purchasers. In some few instances he signed contracts in his own name as agent, but this was done in a few cases only, and the practice, being disapproved of by plaintiff, was discontinued.    The authority of Lund, therefore, with reference to sales of land, was to negotiate for such sales, receive advance payments, if any were made, deliver the contracts or conveyances, when signed, and collect payments of principal and interest provided for in the contracts; the provisions as to payments to be made always containing the stipulation that the money was payable at the office of Lund.    From time to time,—usually monthly, but during two or three years before his death at longer intervals,— Lund would render accounts of all receipts and disbursements, indicating the sources from which the money was received, and the investments thereof made, so that proper credits to purchasers who had made payments could be entered by plaintiff on his books, and account could be kept with reference to persons to whom loans were reported to have been made; and Lund would remit, sometimes in lump sums, sometimes by specific remittances, the amounts

of money for which, according to his reports, he was accountable. This being the situation of affairs in November, 1892, Lund reported sales on contract of two of the quarter sections involved in this controversy to one Thomson, and of the third to one Hansen, sending written contracts to be signed; and these contracts, duly executed, were returned to him and placed on record. Subsequently he reported payments of installments of principal and interest called for by these contracts as having been made in November, 1893, and November, 1894. But as early as October, 1892, and therefore prior to the contracts purporting to be made with Thompson and Hansen, respectively, he had recorded pretended conveyances from Lewis Russ, trustee, to Thompson and Hansen, of the three quarter sections for which contracts were subsequently executed. These conveyances, purporting to be acknowledged by Lewis Russ, trustee, before Lund as notary, are conceded to be forgeries; and it is further conceded that no such persons as Thompson and Hansen, the grantees in these conveyances, ever existed. The lower court decreed the cancelation of these conveyances. In November, 1893, Lund contracted to sell the three quarter sections to Kopesky, executing a contract in his own name; and in the spring of the following year Kopesky took possession, and has occupied the land ever since. The evidence shows that Kopesky had no knowledge as to the title to the land, and took possession thereof relying entirely on his contract with Lund as the pretended owner. Payments were made by Kopesky to Lund in 1893 and 1894. In January, 1896, instruments purporting to be conveyances from Thompson and Hansen, respectively, acknowledged before Lund as notary, conveying the three quarter sections to Kopesky, were put on record. These conveyances are conceded to be fictitious. Subsequently, during the same month, a mortgage from Kopesky to the defendant the Iowa Loan & Trust Company, covering the lands, was put on record

to secure the sum of $7,000 loaned by the company to Kopesky. In the same month of January, and prior to the recording and delivery of the fictitious deeds from Thompson and Hansen to Kopesky, the latter paid to Lund, at Ft. Dodge, $3,000. The draft for that amount, which Lund received from Kopesky, but not showing from whom the money had been received, was transmitted by Lund, from .Ft. Dodge, to the plaintiff, in Chicago. It is around this payment of $3,000 that the contentions of the respective parties in this controversy center, for it is not claimed that any subsequent payments on the land, if any were made, by Kopesky to Lund, were transmitted by the latter to the plaintiff.

It is necessary to state further, however, the circumstances under which this draft was sent by Lund to the plaintiff. It appears that, in the latter part of the preceding year, plaintiff had advised Lund that he would need $15,000, and Lund was directed to raise that amount of money for him; no specific source from which it was to be realized being designated. In December plaintiff came to Algona, seeking a settlement with Lund in regard to a balance of about $10,000, which sum, it appeared from Lund's account, was due plaintiff at that time. Lund gave plaintiff a check for $1,000, reported notes and mortgages (representing investments not previously reported) of over $6,700; and, as already stated, a few days afterwards, plaintiff having already returned to Chicago, Lund sent this draft for $3,000; the total amounting to within less than $200 of the balance appearing to be due plaintiff on Lund's account. Accompanying this draft for $3,000, which was sent, as already stated, from .Ft. Dodge, was a letter, the material part of which seems to have been as follows: "I inclose herewith draft for $3,000, as I telegraphed I would. I could not send Saturday, because, when the money arrived, we had to go seven miles out in the country to find our man to come in and sign the papers,

and that could not be done until today,—Monday,—of course. Hoping this will help you out for the present,"—etc., with the following postscript: "Good I went down, or this thing might have hung fire another week or more."

The contention of plaintiff is, in brief, that the contracts of sale executed by Lewis Russ, trustee, to Thompson and Hansen, were absolutely void, because no such persons existed, and therefore that no title to or interest in the lands in controversy ever passed out of the plaintiff; that Lund had no authority, and did not purport, to contract to convey to Kopesky for plaintiff, and that, as he had no interest in the lands, the contracts which he made in his own name conveyed no interest; and therefore that Kopesky and the Iowa Loan & Trust Company have no title to or interest in the property. The claims of defendants may be briefly summarized as being: First, that Lund had general authority as agent to contract to convey; and, although he executed the contract in his own name, nevertheless it was binding on his principal, by reason of the ratification resulting from the receipt of the $3,000 payment; and, second, that, although Thompson and Hansen were fictitious, Lund had a right to treat these contracts and did treat them, as contracts to convey to him, giving him such interest in the property that he could by his own contract transfer an interest to Kopesky.

The latter of these contentions, which is made especially by counsel for the Iowa Loan & Trust Company, does not commend itself to our judgment. The fact that Lund had already recorded forged instruments of conveyances from Lewis Russ, trustee, to Thompson and Hansen, would seem to negative the idea that he was assuming in good faith to acquire title in his own name, even conceding that no injurious fraud would have resulted to plaintiff had Lund in fact made payments for the property under the contracts for conveyance to the fictitious purchasers. But without expressing any definite conclusion with reference

to this point, we proceed to consider the first contention, which, no matter how it is elaborated, and under whatever different forms it may be presented, seems to us to depend entirely on the question of ratification. We have the unpleasant duty, in attempting to settle this question, of throwing a loss which has resulted from the fraudulent and intentionally wrongful acts of Lund upon one or the other of two parties, neither of whom seems to have been guilty of any intentional wrong, nor even of any negligence calculated to injure any one but himself.

To state the controversy as to this question more in detail, the plaintiff contends that the $3,000 was not transmitted by Lund as the proceeds of any contract of sale of 1. AGENCY; satisfaction: plaintiff's land, but was an individual payment by Lund on his personal account; that fraud: plaintiff had no knowledge or notice that this money was received by Lund from Kopesky in payment under a contract for the lands in question, or for any lands; indeed, that plaintiff had no information that the money was received from Kopesky until after Lund's death, in July, 1896; and therefore it is claimed that the retention of this money, without offer to return it, until, in an amendment to the petition filed in 1900, plaintiff offered to refund that amount if the court should find that, in equity, he ought to do so, did not constitute any ratification of the sale by Lund to Kopesky. For defendants it is claimed that plaintiff was chargeable with notice that the money was received in some transaction in plaintiff's interest, and that by retaining the money he ratified the transaction, whatever it might be, and especially that, by retaining the money, knowing after July, 1896, that it had been received from Kopesky, the plaintiff ratified the sale to him. We think it must be conceded, under the authorities, that if plaintiff received this $3,000 from Lund as Lund's money, in payment of Lund's debts, such receipt would not be a ratification of any transaction of Lund's which was without

authority, so as to bind the plaintiff thereby. Plaintiff would not be bound, when he discovered that this money was received through fraud or by reason of an unauthorized act, to return it. There was no trust attached to the money istelf, for it was paid to Lund as Lund's own money. *Thacher v. Pray*, 113 Mass..29 (18 Am. Rep. 480); *Baldwin v. Burrows*, 47 N. Y. 199, 213; *Ætna Ins. Co. v. Northwestern Iron Co.*, 21 Wis. 458; *Pope v. Lowitz*, 14 Ill. App. 111. On the other hand, if plaintiff was chargeable with knowledge of the fact that this money was transmitted by Lund as the result of some transaction by Lund as plaintiff's agent, then, although plaintiff had no knowledge at the time of the nature of the transaction, or that Lund had exceeded his authority, yet, when he became aware that it was the result of an act in excess of authority, by which he was not willing to be bound, it was his duty to return the money to the party from whom it had been received by Lund. *Fleishman v. Ver Does*, 111 Iowa, 322; *Eadie v. Ashbaugh*, 44 Iowa, 519; *Bank v. Oberne*, 121 Ill. 25 (7 N. E. Rep. 85); *Farmers' & Merchants' Bank of Elk Creek v. Farmers & Merchant's Bank*, 49 Neb. 379 (68 N. W. Rep. 488); *Johnston v. Investment Co.*, 49 Neb. 68 (68 N. W. Rep. 383.)

We think it clearly appears from the evidence that plaintiff had reason to know, and was affected with notice of the fact, that this money was received by Lund as the result of some transaction in which Lund had purported to act as plaintiff's agent with reference to plaintiff's property. As has already been stated, plaintiff had not long before directed Lund to raise for him $15,000, and there is no pretense that it was supposed that Lund was indebted to this extent, and was to pay over that amount on account of any personal indebtedness. Lund had replied to this suggestion about raising money that he would do the best he could, but that those who were indebted to plaintiff were anxious to

2. SAME: evidence of principals knowledge: notice.

postpone payment, and appeared at the time to be unable
to raise the money, and that it would, perhaps, be necess-
ary to institute legal proceedings, which Lund was reluct-
ant to do.   When plaintiff visited Lund, in the latter part
of December, although the object was to have a settle-
ment of accounts with Lund, it seems still not to have
been understood that Lund was personally indebted to the
extent of the balance of the account, in any other sense
than that he had failed to report investments of funds
appearing to be in his hands; and this idea is reenforced
by the fact that plaintiff at that time accepted over $6,000
of investments which Lund then reported as having been
made, and gave Lund credit therefor on his account.
The $3,000, which nearly balanced the account, was
remitted in one draft from another  place than Lund's
place of business, and is reported as having been the result
of negotiations with "our man"; and Lund, in the same
letter, congratulates himself that he looked after the mat-
ter with diligence.   Was plaintiff, then, justified in think-
ing that this $3,000 was raised by Lund from . his own
resources, and transmitted in payment of his personal
obligation?  We clearly think this cannot be conceded.
It appears that, so far as chattel mortgages were concerned,
none of those in Lund's hands for collection or adjustment
called for sums of more than $1,000 each, so that plaintiff
could not have thought that this collection was from a
chattel mortgage debtor.   He must have known, had he
given the matter any consideration, that this money was
raised by some transaction of Lund's relating to plaintiff's
real property, in which Lund had acted as plaintiff's agent.
Under these circumstances, we think it clear, under the
authorities already cited, that, although plaintiff had no
direct information as to what Lund had attempted to do
in pursuance of his agency with reference to collecting
this sum of $3,000, he was bound to know that, in collect-
ing it, Lund had acted as his agent; and it therefore

results that, when plaintiff discovered that the money had been received from Kopesky in pursuance of an unauthorized sale of plaintiff's land to him, plaintiff was bound, if he desired to disaffirm such sale, to return to Kopesky the money received; and, in reaching this conclusion, we think it immaterial that, in making the sale to Kopesky, Lund had, without authority, and even fraudulently, attempted to act in his own name. If Lund had no authority whatever to sell the land to Kopesky, then it was plaintiff's duty to return to the latter the money which plaintiff had received as the result of such unlawful sale. He had taken the proceeds of the sale on the assumption that Lund was his agent. He could not retain them, and at the same time disaffirm Lund's agency to act in his behalf, although in Lund's own name, in making such sale.

This conclusion makes it unnecessary to discuss many other questions which are argued by counsel, and leads to the result that the decree of the lower court, denying plaintiff any relief as against Kopesky and the Iowa Loan & Trust Company, was correct, and it is AFFIRMED.