J. L. HASWELL v. L. S. STANDRING and others, Appellants.

**Principal and agent:** RELATIONSHIP OF TRUST AND CONFIDENCE. The
relation of principal and agent is essentially one of trust and
confidence, and the principal may rely on the good faith of his
agent until advised in some manner that he is not worthy of
such confidence; the principal is not bound to presume that his
agent will attempt to defraud him.

**Same:** RATIFICATION OF AGENT'S ACTS: EVIDENCE. Proof of ratifi-
cation of an agent's unauthorized act must be clear and express,
or implied from circumstances equally clear and undisputed.

**Same:** KNOWLEDGE OF AGENT'S ACTS: PRESUMPTION. Knowledge of
the terms and conditions of an unauthorized contract entered
into by an agent is not to be presumed from the fact that the
principal had a reasonable opportunity to acquire such knowledge,
but there must be a wilful disregard of the means of knowledge
within his possession and control. The mere fact that the prin-
cipal had misapprehended or mistaken material facts, although
he had entirely omitted to make inquiry concerning them is not
sufficient to bind him.

**Partnership:** ESSENTIAL ELEMENTS. An agreement to share simply
the profits of a transaction will not establish a partnership;
there must also be an agreement to share the losses, although
this may be inferred from other provisions of. the contract.

**Principal and agent:** FRAUD IN SALE OF LAND: QUIETING TITLE:
RELIEF. The plaintiff in this action owned land which his agent
sold to defendants as his own after having forged a deed thereto
from plaintiff to himself. Afterward he made a pretended sale
for plaintiff to another and made a partial payment on the ficti-
tious sale. *Held,* that plaintiff can not retain the money so
received and at the same time quiet his title against defendants,
even though it was not shown that the money so paid was part
of that received by the agent from defendants, but that the
same should be treated as belonging to defendants; and that
to do complete equity defendants are permitted to pay plaintiff
such further sum in addition to that received from his agent as

shall equal the price he was to have received from a sale which
the agent was authorized to make.

Evans, J., dissenting.

*Appeal from Kossuth District Court.*—HON. A. D. BAILIE,
Judge.

THURSDAY, SEPTEMBER 28, 1911.

SUIT in equity to quiet title. Judgment quieting
title in plaintiff, but ordering him to return a sum of
money to the defendants. Both parties appeal. *Modified
and affirmed* on condition, and remanded for decree.

The opinion states the case.

*Burt J. Thompson* and *Kelleher & O'Connor,* for
plaintiff.

*Nagle & Nagle, Birdsall & Birdsall,* and *Ladd &
Rogers,* for defendants.

SHERWIN, C. J.—The plaintiff is a resident of the
state of New York. In 1898 he purchased the land in
controversy through John H. Standring, who was then the
cashier of the First State Bank of Corwith, Iowa, under
an agreement with Standring that plaintiff was to furnish
the purchase money, and that Standring was to look after
the land, guarantee the plaintiff six percent on the pur-
chase price out of the rents while he held the land, and
have one-half of the advance when the land was sold. The
plaintiff took the title in his own name, and the deed was
duly recorded. January 9, 1902, John H. Standring made
a contract in his own name with the defendants George
Schumacher and David Huntley for the sale of said land
to them for $6,800, to be paid as follows: $500 in cash,

which was paid at that time, and the remainder on March 15, 1902, on delivery of a warranty deed and an abstract showing good title.  On the 1st day of March, 1902, there was recorded in the office of the recorder of Kossuth County a warranty deed in the usual form, purporting to have been made by the plaintiff and his wife, on the 18th day of February, 1902, and conveying the land in question to L. S. Standring.  This deed was a forgery, and the plaintiff had no knowledge of it until a short time before this suit was commenced.  March 7, 1902, L. S. Standring made a deed conveying the property to George Schumacher and David Huntley, and on the 14th day of March, 1902, the deed was delivered to said purchasers, and they then paid the remainder of the purchase price and took possession.  As the purchase price was paid, John · H. Standring immediately deposited it to his individual credit in the bank of which he was the cashier.  The plaintiff was never advised of this pretended sale to Schumacher and Huntley, nor did he ever receive any part of the purchase price paid by them.  Standring accounted to the plaintiff for rent of the same land for 1902.  January 16, 1903, he wrote the plaintiff that he had an offer of $35 per acre for the land, and stated that $500 would be paid in cash, $1,000 on the 1st day of May, 1,000 on the 1st of September, and the remainder in five years, with the privilege of paying multiples of $100 on any interest day.  On the 21st of January, 1903, Standring again wrote the plaintiff concerning the offer he claimed to have received for the land, and said:  "And then another reason why I think you should sell now is the lands in this vicinity are rather low and the county surveyors are now laying out a big ditch that will run through this land and the cost· of the ditch will be assessed up against the adjoining land in proportion to the benefits derived.  It is not so much the cost in ·the case of your land, but it is having a ditch run right across it which will hurt the sale of it.  The party making the offer

is an adjoining landowner and it will not make so much difference to -him." The plaintiff finally concluded to sell on the terms stated by Standring and so advised him. On the 19th of March, 1903, Standring sent the plaintiff a draft for $500 as the first payment under the contract. Up to that time Standring had not given the plaintiff the name of the purchaser, and on the 25th of the same month plaintiff wrote him, asking for his name and residence. Standring also sent the plaintiff $1,000 about the 13th of May, 1903, and $1,000 about the 1st of September, 1903; both of said remittances purporting to be payments on the contract authorized by the plaintiff. September 1, 1903, plaintiff forwarded a deed to the land, in which Andrew Howie was named. as the grantee, and in a few days thereafter he received from Standring a note of $3,100, payable to John L. Haswell, dated September 1, 1903, due September 1, 1908, purporting to have been executed by Andrew Howie, and a mortgage on the land in question, purporting to secure said note and to be executed by said Howie. The mortgage appeared to have been duly recorded in Kossuth County on September 5, 1903. The purported contract with and sale to Howie was false from beginning to end. Howie did not purchase, nor did he agree to purchase, the land. He did not pay any money to Standring, nor did he execute the note and mortgage which Standring sent to the plaintiff. The plaintiff's deed of the land was not delivered to Howie, nor to any one else, and the purported recording of the mortgage sent to plaintiff was false. Interest coupons were attached to the Howie note, and as they purported to become due the plaintiff sent them to Standring for collection. Standring remitted the interest promptly for four years, and the first knowledge that the plaintiff had that his transactions with the bank or Standring were not all right was conveyed to him in a letter from Standring himself written at Minneapolis, Minn., November 17, 1907, after he had absconded,

in which he told plaintiff that the First State Bank of Corwith had closed, that he was a fugitive, and that the mortgages received by the plaintiff from him were forgeries.

The defendants contend that the plaintiff ratified the sale of the land to them, and is estopped from now claiming it. They say that but one sale of the land was made, and that was made to Schumacher and Huntley on contract, and that when the plaintiff received from Standring the remittance of $500, in March, 1903, he was advised that it was a part of the purchase price of the land, and by retaining the money he ratified the sale. It is also said that when the principal receives from his agent the proceeds of an unauthorized act he can not ignorantly or purposely shut his eyes to the means of information within his reach, and thereby avail himself of the benefits of the transaction and later repudiate it, and that Standring's letter of March 19, 1903, accompanying the remittance of $500, put the plaintiff on inquiry as to whom the land was sold. It is true that a principal will not be permitted to ignorantly or purposely close his eyes to the nature of his agent's acts and thereby escape the consequences of a ratification thereof, but this rule has no place in this case. The letter containing the remittance was written on the 19th of March, and could not have reached the plaintiff in New York earlier than the 21st or 22d of the month, and on the 25th of the same month the plaintiff wrote Standring asking him for the name of the purchaser. Just when the plaintiff received this information is not definitely shown by the record, but we do not consider the matter of controlling importance. There was nothing unusual in the transaction, nor was there anything which should have aroused the suspicion of the plaintiff and started an independent inquiry on his part. The relation of principal and agent is essentially one of trust and confidence, and the plaintiff might rely upon the faithfulness of his agent, until advised in

1. PRINCIPAL AND AGENT: relationship of trust and confidence.

some way that he was not worthy of the confidence. In
other words, the plaintiff was not bound to presume that
his agent would try to defraud him. In respect to the
entire Howie transaction, the plaintiff had the right to
rely upon the fidelity of Standring, and he was not negli-
gent in not making an independent investigation for the
discovery of possible fraud on the part of Standring. *Faust
v. Hosford,* 119 Iowa, 101.

It is very evident that the plaintiff did not ratify
the sale to Schumacher and Huntley. He knew absolutely
nothing of that transaction until after November, 1907. It
was a cash sale for $6,800, while the pre-
tended sale to Howie was for $5,600, $3,100
of which was deferred and secured by a pre-
tended mortgage back on the land. When the plaintiff
received the purported payments from Standring, he sup-
posed, and had every reason for so supposing, that they
had been made on the sale that he had authorized Standring
to make more than a year after the sale to Schumacher and
Huntley on the strength of the forged deed. Standring had
no authority to make a sale to Schumacher and Huntley,
nor to any one else at that time, and the plaintiff can only
be bound by his subsequent ratification of the unauthorized
act, and it is the rule that such ratification must be clear
and express, or be implied from circumstances equally clear
and undisputed. *Waughtal v. Kane,* 108 Iowa, 268.

2. SAME: ratifica-
tion of agents'
acts; evidence.

It is not claimed that the plaintiff had actual knowl-
edge of the sale to Schumacher and Huntley. The claim is
that he could have ascertained the facts relative thereto,
and hence is bound. The contention is not
sound. Had plaintiff gone to the records of
Kossuth County after the forged deed to L.
S. Standring had been recorded, he would undoubtedly
have discovered the fraud of his agent, but he was under
no legal or moral obligation to do so under the facts in this
case. It is a well-settled rule that knowledge of the

3. SAME: knowl-
edge of
agents' acts:
presumption.

terms and conditions of an unauthorized contract, entered into by an agent, is not to be presumed from the fact that the principal had a reasonable opportunity to acquire such knowledge. *Milling Co. v. Hughes,* 8 Kan. App. 514 (56 Pac. 143); *Bank of Phoenix v. Brown,* 9 Ariz. 311 (83 Pac. 362). In *Combs and Others v. Scott,* 12 Allen, 493, the Supreme Court of Massachusetts, speaking through Chief Justice Bigelow, said:

Ratification of a past and completed transaction, into which an agent has entered without authority, is a purely voluntary act on the part of the principal. No legal obligation rests upon him to sanction or adopt it. No duty requires him to make inquiries concerning it. Where there is no legal obligation or duty to do an act, there can be no negligence in an omission to perform it. The true doctrine is well settled by a learned text-writer. 'If I make a contract in the name of a person who has not given me an authority, he will be under no obligation to ratify it, nor will he be bound to the performance of it.' 1 Livermore on Agency, 44. See, also, Paley on Agency, 171, note O. Whoever, therefore, seeks to procure and rely on a ratification is bound to show that it was made under such circumstances as in law to be binding on the principal, especially to see to it that all material facts were made known to him. The burden of making inquiries and of ascertaining the truth is not cast on him who is under no legal obligation to assume a responsibility, but rests on the party who is endeavoring to obtain a benefit or advantage for himself. This is not only just, but it is practicable. The needful information or knowledge is always within the reach of him who is either party or privy to a transaction which he seeks to have ratified, rather than on him who did not authorize it, and to the details of which he may be a stranger. We do not mean to say that a person can be wilfully ignorant or purposely shut his eyes to means of information within his own possession and control, and thereby escape the consequences of a ratification of unauthorized acts into which he has deliberately entered; but our opinion is that ratification of an antecedent act of an agent which was unauthorized can not be held valid and binding where the person sought

to be charged had misapprehended or mistaken material facts, although he may have wholly omitted to make inquiries of other persons concerning them, and his ignorance and misapprehension might have been enlightened and corrected by the use of diligence on his part to ascertain them.

See, also, *Mitchell v. Squire,* 128 Iowa, 269; *Russ v. Hansen,* 119 Iowa, 375; *Britt v. Gordon,* 132 Iowa, 431. That Standring's knowledge of his fraudulent transaction can not be imputed to the plaintiff is well settled. *Britt v. Gordon, supra.* Another fact which should not be forgotten is this: That Standring in dealing with the defendants did not purport to act as the agent of the plaintiff. So far as the record shows, the plaintiff's name was never mentioned in the transaction, and the reason for this is that the record title stood in the name of J. L. Standring. The forged deed from Haswell to J. L. Standring had been recorded, and as that made a record title apparently perfect in said Standring there was no occasion to use Haswell's name. On the contrary, there was every reason why he should not purport to act as the agent of Haswell; for, had he attempted to make the sale as such agent, his forgery would probably have been discovered at once.

The defendants also contend that the plaintiff and Standring owned the land as partners, and that Standring's sale thereof to the defendants was a valid sale and binding on his copartner, the plaintiff. The evidence does not sustain the appellants' claim, however. Under the rule in this state, the mere showing of profits does not create a partnership. An essential element of the relation is the obligation to share losses also. *Winter v. Pipher,* 96 Iowa, 17; *Johnson Bros. v. Carter & Co.,* 120 Iowa, 355. It is not necessary that there be an express agreement to share the losses of the venture. Such an agreement may be inferred from other provisions of the contract, "the nature of the business, and

4. PARTNERSHIP: essential elements.

the relation of the parties to the business to be transacted."
*Richards v. Grinnell,* 63 Iowa, 44. The contract between
the plaintiff and Standring was that the latter should buy
land for the plaintiff, guarantee the plaintiff interest on
the money he so invested, and have one-half of the net
profit when the land was sold. In this case, the evidence
shows that the annual rent from the land about paid the
plaintiff six percent interest on his original investment,
and the taxes on the land, so that Standring was entitled,
under the contract, to one-half of the amount it sold for
above the original price. There is nothing in the contract,
or in the nature of the particular transaction, tending even
to show an agreement to share losses. *Winter v. Pipher,*
*supra,* and *Porter v. Curtis et al.,* 96 Iowa, 539, are di-
rectly in point and decisive of this question.

The plaintiff received from Standring $2,500 in cash,
which Standring said had been paid by Howie on the pur-
chase price of the land, and notes and a mortgage secur-
ing the same for $3,100, representing the
remainer of the purchase price. Under the
contract between the plaintiff and Standring,
the latter was to have one-half of the ad-
vance when the land was sold. The pretended sale to
Howie was for $1,600 more than plaintiff had paid for the
land, and, as the rents plaintiff had received therefrom
gave him six percent on his original investment, Standring
was entitled to $800 under their contract, and this amount
the plaintiff returned to Standring. In his pleadings, the
plaintiff offered to return the money received, if it was
found equitable for him to do so, and the trial court held
that he should return the amount he had received on the
sale, less the $800 that had been returned to Standring.
The plaintiff appeals from this finding, because it is not
shown that any part of the money sent to him was the
money paid by the defendants, and states that Standring
and the bank owed him over $20,000 independent of the

5. PRINCIPAL AND
AGENT: fraud
in sale of
land; quieting
title; relief.

transaction in question. It is probably true that the plaintiff did not receive any part of the money paid to Standring by the defendants. Standring deposited this money in the Bank of Corwith to his own credit more than a year before any payment was made to plaintiff, and it is conclusively shown that he was then using for his individual purposes more money than he had on deposit. But, notwithstanding this condition, we are of the opinion that the plaintiff can not justly complain of the order. He was and is offering to do equity, and it would not be equitable to permit him to keep money which he supposed came from the sale of his land, and at the same time have the land. For the purpose of doing equity, the money may be treated as belonging to the defendants.

A majority of the court is also of the opinion that the plaintiff can not justly complain if still further relief is here granted the defendants. The plaintiff was willing to sell the land for $5,600, and supposed he had made a sale thereof for that amount. The defendants were also acting in perfect good faith and without any knowledge of Standring's rascality in general or in this particular transaction. Both parties were innocent of wrongdoing or of carelessness, and yet both were the victims of Standring's wrong. If, therefore, a result can be reached which will give the plaintiff all that he wanted or expected from the land in question, and at the same time give the defendants the advantage of the price fixed by the plaintiff himself, it will as nearly reach an equitable result as can be done without violating well established rules. In other words, if the plaintiff receives all that he could possibly have received for his land, had a sale in fact been made to Howie, he will suffer no actual loss, and the defendants may be saved something by reason of the advance in the value of the land since their supposed purchase. It is our conclusion that the defendants may, if they so elect to do, within sixty days from the date of filing this opinion, pay

the plaintiff the sum of $3,100, with interest thereon at the rate of six percent per annum from September 1, 1907, the plaintiff having received interest to said date, and that upon the payment of such sum the plaintiff shall retain the sum paid on the land by Standring and execute a deed to the defendants, conveying title to the land. If the plaintiff shall refuse to accept said sum and execute a proper conveyance as herein required, the money may be deposited with the clerk of the district court, for the use and benefit of the plaintiff, and a deed may be made. by a commissioner appointed by the court, or the title shall be quieted in defendants by decree, as they may elect. If the defendants shall neglect or refuse to perform the conditions herein required of them, the decree of the district court shall stand affirmed.—*Modified* and *affirmed* on conditions, and *remanded* for decree in harmony herewith.

EVANS, J. (dissenting).—I am persuaded that the defendants are entitled to full relief in this case, and in support of this view I shall venture into a somewhat elaborate discussion of the evidence in the case.

The land in controversy is described as the northeast quarter of section 13, Twp. 95, R. 27, in Kossuth County. There are many defendants in the case. The rights of all, however, are dependent upon the right of defendants George Schumacher and David Huntley, whose claimed legal title to the land rests upon the alleged forged deed. For convenience of discussion, I shall refer to Schumacher and Huntley as the "defendants." The record before us presents a case wherein a great fraud was perpetrated by one John H. Standring, formerly of Corwith, Iowa, and now an absconded defaulter. Such fraud was perpetrated in his dealings with the plaintiff, on the one hand, and with the defendants, on the other. The plaintiff and defendants are innocent of wrong, but one or the other of them must suffer loss resulting from the fraud of Standring. We

are confronted with the painful duty to determine upon which innocent party such loss must fall.

The plaintiff obtained the legal title to the land in question in September, 1898. The defendants obtained what appeared to be the legal title in March, 1902. Prior to the acquisition of the purported legal title, the defendants had entered into a contract of purchase of said land with John H. Standring, whereby they agreed to pay a purchase price of $6,800. This contract will be set out later herein. This contract was performed on the defendants' part, and they received through Standring what appeared to be a good legal title. They thereupon entered into the occupancy of the land, and have so continued ever since. The chain of title under which they hold consists of a deed purporting to be executed by the plaintiff and his wife to L. S. Standring as grantee, and a deed by L. S. Standring to the defendants as grantees. The first-named of the foregoing deeds was an undoubted forgery, and the defendants now claim nothing thereunder. The defendants claim, however, that the contract of purchase between them and Standring was and is valid and binding upon the plaintiff for the following reasons: (1) Because Standring was a partner with the plaintiff in the ownership of the land, and as such his act was necessarily binding on the plaintiff. (2) If he was not a partner, he was the agent of plaintiff, with general authority to sell this land. (3) If Standring acted in excess of authority, yet the plaintiff received from him $2,582 of the purchase price, which he has always retained, and he has thereby ratified the sale.

A determination of the case requires the consideration of many details. I will, however, state first the more salient facts, and details can be supplied in the course of the later discussion. The plaintiff was a resident of New York. John H. Standring is his first cousin. For some years prior to 1895, business relations had existed between

plaintiff and the father of John H. Standring. This business consisted in investing funds for the plaintiff. The form of investment was principally loans secured by Iowa mortgages, but a part of it consisted also in the purchase of Iowa real estate. About 1895 this business began to be transacted for the plaintiff by John H. Standring, and he continued to transact the same for the plaintiff until he absconded in November, 1907. In 1898 Standring sold for the plaintiff forty acres of Iowa land and received $1,000 therefor. Later in the same year he purchased the one hundred and sixty acres of land involved in this controversy, under an arrangement with plaintiff which will be considered more in detail later. Its purchase price was $4,000. This amount was made by the $1,000 then in Standring's hands and $3,000 sent by plaintiff for that purpose. Standring transacted the business and took title in the plaintiff. The plaintiff never saw the land, either before his purchase or after. Standring cared for it and rented it, and paid the taxes out of the rents, and remitted the balance from year to year, and so continued down to 1902, when he purported to sell the same to defendants. Such contract of sale was as follows: "We, George Schumacher & David Huntley of Clarion, Wright Co., Iowa, hereby agree to purchase of J. H. Standring the following land, to wit: The northeast quarter (N. E.) section thirteen (13) township ninety-five (95), range twenty-seven (27), W. of 5th P. M. Kossuth County, Iowa, containing one hundred and sixty acres more or less according to government surveys, also subject to legal roads and highways, for which I agree to pay $6,800.00 as follows: $500.00 cash, receipt hereby acknowledged. $500.00 note due March 15th, 1902, with interest after due eight percent. $5,800.00 cash March 15th, 1902, on delivery of warranty deed and abstract showing good title, said J. H. Standring to furnish me a warranty deed of said land March 15th, 1902, from date hereof which said J. H. Standring binds him-

self to do. In case of my failure to perform this contract strictly, and at time agreed, I will pay J. H. Standring $1,000.00 as liquidated damages at Corwith Iowa, and also forfeit my right to this contract, and J. H. Standring forfeits same amount if he fails. Exchange of papers to be made at Bank of Clarion, Iowa, without cost or exchange to J. H. Standring. Possession given when transfer is completed. Witness our hands this 9th day of January, 1902. J. H. Standring. Geo. Schumacher. David Huntley." This is the contract upon which defendants now rely, and upon which they ask that their equitable title be quieted.

Standring witheld from the plaintiff all information concerning the same, and affirmatively pretended to have rented the land for the season of 1902. In January, 1903, however, he submitted to plaintiff a pretended offer of $5,600, payable in installments of $500 cash, $1,000 May 1st, and the balance on five years time at six percent interest. Upon receiving the plaintiff's assent he reported the land as sold. This was followed by successive remittances of the purchase price, amounting to $2,582. The first was a remittance of $500, made on March 19th, followed by $1,000 on May 1st, and $1,082 which reached the plaintiff on September 1st. He did not purport to give the name of the purchaser at any time prior to August 27, 1903. On this date he sent in the name of the purchaser as Andrew Howie. The plaintiff thereupon inserted this name in the deed as grantee, and forwarded the same to Standring. The statement that Howie was the purchaser was unqualifiedly false. No such person had ever had any negotiations with him for the purchase of said land. The defendants were the only persons to whom he had ever sold or pretended to sell such land, so far as is disclosed by this record. So far as known, he never made any use of the deed so sent to him by the plaintiff. He sent to the plaintiff, however, a note and mortgage for $3,100, purporting to be executed by Andrew Howie as a part of the pur-

chase price of such land. These also were spurious, but Standring paid the interest thereon annually for several years. That he was the agent of plaintiff for many purchases is not disputed. That he had a large discretion in dealing with much of plaintiff's business is also clear under the evidence. Whether his relation to this particular land and the business pertaining thereto was such as to authorize him to enter into the contract of sale above set forth is, of course, a strategic point in the case. I will turn for a moment to the salient facts relating to the nature and genesis of his authority in this respect.

There was a special contract entered into between plaintiff and Standring in relation to this land *prior* to its purchase. This contract dealt both with the proposed purchase and with the future sale of the land. Such contract was contained wholly in the correspondence between the parties. The letters containing the same have not been produced. The same have been lost or mislaid. It so happens, however, that a letter written by plaintiff to Standring on September 8, 1903, contained a recital of plaintiff's understanding of such contract. Such letter is in evidence, and is as follows: "Sept. 8, 1903. Dear John: Your favor of the 3rd at hand with draft for $1,082.00. According to the agreement made at the time this land was purchased just five years ago (Sept. 6, 1898) I was to pay you one-half of the advance when sold and you would guarantee me six percent on the purchase price out of the rents while I held the land. As I figure it the net amount I have received during the five years is almost exactly the six percent. I must therefore owe you $800, and the draft should have been for $282.00. If you make it the same let me know and I will send you draft for $800. If I have made a mistake please send me your figure. Can't you let me know when you are coming. In haste, John." To this recital Standring assented, whereupon plaintiff wrote him again as follows: "Sept. 14, 1903. Dear John: Yours

of the 11th at hand. Enclosed please find N. Y. Df't for $800, your share of profits on sale of the ¼ Sec. 13—95—27." The course of dealing between the parties was that Standring purchased the land with the money furnished by plaintiff, as already indicated, and took the title in plaintiff's name. He also took possession of the land and rented the same. He exercised his own discretion as to the persons he selected as lessees and as to the amount to be paid, but remitted to plaintiff the rent when paid, after first paying the taxes.

I. The first proposition urged upon us by the defendants is that the contract above set forth created a partnership between these parties as to this particular property. If this be so, Standring necessarily had authority to enter into a contract with the defendants. It is well settled that a mere agreement for a division of profits without more does not create a partnership. A partnership contemplates an obligation to share losses, as well as profits. It is well settled, also, that a mere agreement to render compensation for services or to pay a commission in the form of profits does not give rise to an obligation to share losses, and does not create a partnership. The contention of plaintiff is that the agreement between him and Standring was an agreement to pay a commission in the form of profits and nothing more. One difficulty with this contention is that the plaintiff himself testified: "I think there was nothing said in the letters between us as to what the one-half of the profits above six percent was to be for." So far, therefore, as anything was specified between the parties, it appears to have been an agreement for "profits as profits," in the sense in which that expression is used in books.

While it is true that an obligation to share losses is essential to a partnership, it is not necessary that the contract of the parties should contain express provision to that effect. Such an obligation may be inferred from the terms of the instrument as a whole and from the relation of the

parties to the business to be transacted. *Richards v. Grin-nell,* 63 Iowa, 51. In *Johnson v. Carter & Co.,* 120 Iowa, 355, it was said: "Of course, the mere sharing of profits will not be construed as establishing the partnership rela-tion. *Ruddick v. Olis,* 33 Iowa, 402. But it is an import-ant circumstance to be taken into consideration. The obli-gation to share losses is an essential element to its existence. *Winter v. Pipher,* 96 Iowa, 17. But enterprises are not usually undertaken with a view of loss, and the mere fact -that provision therefor is not expressly made does not pre-clude the inference that each partner is to bear his portion of the burdens, as well as reap his share of the benefits of the venture. "An agreement to share profits, nothing being said about losses, amounts *prima facie* to an agreement to share losses also, for it is but fair that the chance of gain and of loss should be taken by the same persons, and it is natural to suppose that it was their intention, if they have said nothing to the contrary; and accordingly it has been held that, unless an intention to the contrary can be shown, persons engaged in any business or venture, and sharing the profits to be derived from it, are partners as regards the business or adventure." 1 Lindley on Partnership (Ewell) 30. "In the decisions of this court denying the existence of a partnership because of there being no obligations to share the losses, the agreements have been such as to exclude any such inference."

It can not fairly be said that the agreement now under consideration excludes the inference of the obligation to share losses. On the contrary, there is an express under-standing to share in the losses of accruing interest, if the rents fail to meet the same. In *Canada v. Barksdale,* 76 Va. 899, it was held that: An agreement between two persons to buy a tract of land together and sell it and divide the proceeds makes them partners in the specula-tion. In *McPherson v. Swift,* 22 S. D. 165 (116 N. W. 76, 133 Am. St. Rep. 907), it was held that: An agreement

by two persons to purchase land with the money of one of them, to be cared for by the other, and to share equally the profits after repaying the purchase money and interest, and to bear equally the cost and expenses of carrying and selling it and the ultimate loss if any, is a partnership, not an 'agency or employment. In *Benners v. Harrison*, 19 Barb. (N. Y.) 53, it was held that: An agreement between two persons that one will supply cash with which the other is to buy lands in his own name, to be disposed of for their joint profit, stipulating against liability of the capitalist for losses beyond the sum contributed by him, makes a partnership in respect to services rendered by an employee in the enterprise. In *Tanner v. Hughes,* 21 Ky. Law Rep. 77 (50 S. W. 1099), it was held that: An agreement between two persons to buy a tract of land jointly, and cut and dispose of the timber upon it for their joint benefit, and, after deducting the cost and expenses, to divide the proceeds, makes them partners with respect of a saw miller employed by one of them to saw the logs. In *Boreing v. Wilson,* 33 Ky. Law Rep. 14 (108 S. W. 914), it was held that: An arrangement entered into by three persons to purchase lands and hold them for joint account for sale when the value has increased, upon an agreement that whatever money any one of them advanced to further the common enterprise should be first returned to him with interest, and then that the profits should be equally divided among all three creates a partnership. In *Winstanley v. Gleyre,* 146 Ill. 27 ((34 N. E. 628) it was held that: A partnership is created between the contracting parties by an agreement to subdivide, plat, advertise, and sell land belonging to one of them, the others defraying the incidental expenses of the enterprise, and, after paying the landowner a stipulated amount out of the first proceeds realized, to share equally in the money arising from the sales. In *Frazer v. Linton,* 183 Pa. 186 (38 Atl. 589), it was held that: An agreement by several persons to co-

operate in selling land for the acquisition of which one of them has an option, and to divide the profits, makes them partners.

Cases of this kind are border line cases, and the authorities are not entirely harmonious with reference to them. Each case is necessarily made to turn upon its own peculiar facts. Certain it is that the relation of Standring to plaintiff in this transaction was something more than that of a mere agent or broker, to be selected or discharged at the will of his principal. The land was purchased for the purpose of reselling at a profit. The contract between the parties provided for the sale, as well as for the purchase. This contract was made prior to the purchase, and before the plaintiff himself acquired any interest in the land. The purchase of the land for him was made in pursuance of it. The contract does not in express terms provide by whom the land was to be sold. But the surroundings and the conduct of the parties and the later correspondence all show that Standring was to conduct the enterprise to its conclusion. Under this contract the purchase of the land, the management of it, and the sale of it all became parts of the same enterprise. Standring was the only person in active charge of it. Not a word appears in the correspondence on the subject of commission or compensation for services or for collection fees. That he exercised his own discretion in the matter of renting is clear. That he had authority to exercise discretion in carrying out the enterprise is indicated by the following excerpts from plaintiff's letters to him: "Have you made any agreement for this year?" Again: "Have you rented this and the Minn. Sec. for this year? If rented what are the terms?" Again: "What arrangements have you made for this year?" Again: "Have you rented the quarter section in Kossuth Co. for this year and on what terms?" Again: "Do you expect to *sell* that quarter this summer?" Of course, the foregoing quotations are not controlling on the question of

partnership, but they are consistent with it. They are also consistent with an assumed agency, but they indicate a broad authority.

It seems clear to me, therefore, that the interest of Standring in this enterprise was something more than a mere agency, terminable at the will of the principal. Whether the arrangement between them amounted to an actual partnership as to this particular transaction is a more difficult question. I incline to the view that such it was. But the question is so close at this point that I am not willing to base a dissent upon it. I have indulged in the foregoing discussion as preliminary to a consideration of the question of actual authority, regardless of the question of partnership. To this part of the discussion I now proceed.

II.   An examination of the entire record convinces me that the relations of these parties were such that Standring did have actual authority to sell the land in question, and this is so, even though we do hold that his interest in the enterprise was something other than a partnership. The facts which I have already discussed in the foregoing paragraph are important to be considered upon this proposition.   In addition to such facts, we may also at this point take into consideration other transactions between these parties as tending to show a very general authority exercised by Standring over all the business of the plaintiff in Iowa and Minnesota.   Prior to the purchase of the land in question, Standring had bought and resold for plaintiff a tract of forty acres, the proceeds of which went into this purchase.   At about that time plaintiff was also the owner of certain lots in Des Moines, which had been purchased for him by Standring's father.   Standring exchanged these lots for a section of land in Minnesota.   He rented this section for the plaintiff for some years, and finally sold a quarter section thereof.   The remaining three quarters he traded for a farm of two hundred and forty acres in

another county. He also bought one hundred and sixty acres of land in Minnesota, under an arrangement similar to the one under which the Kossuth County land was bought. This also he sold at a profit, and the proceeds were divided between him and plaintiff. Plaintiff never saw any of the properties now enumerated, but acted in all cases solely upon the advice and judgment of Standring. We would not be justified in saying that he had general authority to act for plaintiff in these other transactions, because the details of the same are not before us; but the extent of these transactions and the relations of the parties thereto throw some light upon the conduct of the parties with reference to the transaction under consideration, and furnish some aid in the inferences of fact which we may properly draw therefrom. The following is an excerpt from a letter of the plaintiff, written in October, 1902:

·  Dear John: Your letter of the 11th at hand. I hope you can *sell* all the land in Traverse Co. before December 1st. You did not write me the amount of rent to be paid Jan. 1st. Please do so in your next letter.

The following is from one of Standring's letters:

I have a trade on the string for this land which if it can be made, I believe will be a good one for you. A party here has 240 acres near Foxhome that he is offering for $30 per acre. It is nearly all under cultivation and has a very fair set of improvements and can be rented for one-third of the crop delivered in town. It is well located and is a good piece of land and well worth the money. *I have offered to trade* him your 480 acres at $17 per acre and take his 240 acres at his price, $30. On this kind of a deal there will be coming to you $960. He can not pay this now and I have offered to take a mortgage on the 480 acres for the amount, due on or before two years at six percent. Now he has agreed to go and look at the land next week and let me know whether he will trade or not. I am sure this would be a good deal for you and hope you will think favorably of it. While there is quite

a difference in the price, per acre, the Foxhome land is
well worth it. It will also be easier to rent and look after.
Please advise me soon as possible what you think of it so
I will know what to tell him when he gets back.

As bearing upon the terms of the contract in the par-
ticular transaction under consideration, plaintiff calls our
attention to a letter written by himself in May, 1902, in
which the following is found:

I would much prefer to·buy a piece of land as I did
the ¼ Sec. 13—95—27. Something that in your judg-
ment would net me a good advance in a year or two and
during the time I owned it would bring in yearly at least
five percent on the money invested. Anything I buy must
be clear of every incumbrance. I am sorry to have caused
you any trouble or inconvenience but am sure I wrote
you my limit was $4,000. If you care to invest $4,000
for me in this way I will either pay the regular commis-
sion *when bought and sold* or bind myself in writing to
divide the profits equally between us, after deducting in-
terest on the purchase price.

To this Standring replied as follows:

Roy has written me about a quarter section near Fox-
home that he thinks can be got for $25 per acre. I know
the land and have written him to secure if possible and
will hear from him by time I return. This will take
$4,000 just the amount you wish to invest and I will figure
on your taking it on the proposition mentioned in your
letter. That is, *you carry it* and divide the profits after
allowing you five percent.

The contention of plaintiff is that this correspondence
should be held as duplicating the terms of the prior con-
tract. It is also the contention of the plaintiff that Stand-
ring sustained to him the mere relation of a broker in such
transaction, and the case has been argued largely upon that
theory. As I have already indicated in the previous para-
graph, Standring's agency to sell was not created by mere
appointment. It was *contracted* for before he made the

purchase. His right to exercise authority to sell was essential to the success of the enterprise, as the parties were situated. Surely he must be deemed to have had authority to carry out such enterprise as the original contract contemplated. The land was bought *to be sold* at a profit. Authority to sell the land at a fair profit was implied in the contract and the circumstances surrounding it. If he had undertaken to sell the land for less than the plaintiff's investment, it might have presented a different question. But the land had advanced in price. There was a profit in the transaction. Under those circumstances the particular price which could be realized for the land was a matter in which Standring had equal interest with the plaintiff.

The fact that Standring guaranteed six percent interest out of the rents while the investment was carried implied a right on his part to terminate such liability by the sale of the property at a fair profit and a fair price. Surely plaintiff would have had no arbitrary right to forbid such a sale. He could not arbitrarily elect to hold the farm as a continuing investment of his own against the will of Standring. To do so would have been a breach of his contract. The contract, as construed by the parties, required Standring to secure to plaintiff six percent *net*. Standring first paid all taxes and current expenses out of the rents and remitted the balance. Under this construction, Standring became a guarantor for the taxes, as well as for the six percent. This undertaking was fully performed by Standring. When the value advanced to a point of fair profit, the enterprise had reached its goal. The only way that Standring could consummate the contract and terminate his liability as guarantor was to sell at a fair profit and price. That he should advise with the plaintiff was in accord with the usual method of fair business. But, as to the rest of the world, it was not essential to the validity

of his contract. He was contracting on his own behalf, as well as on behalf of the plaintiff.

A denial of authority in Standring to accept instanter an advantageous offer for the land would run counter to the very purpose for which the contract was entered into. The sale to the defendants was an advantageous one; $42.50 an acre was a larger price than had ever been mentioned in the correspondence of the parties. If we were to adopt the later correspondence with reference to the later purchase as a duplicate of the missing correspondence, it would not put the case in any different light at this point. The plaintiff's letter in that case contemplates something more than the purchase of the land. The land must be both "bought and sold." In accepting this proposition, Standring put this construction upon it: "That is, *you carry it* and divide the profits after allowing you five percent." Standring's undertaking was not fulfilled in that case by merely buying the land. He must also sell it at a profit, if possible. ·He did so in that case, and the profits were divided. The plaintiff in that case, by the terms of the correspondence, simply *carried* the necessary investment for the purpose of the speculation, and was allowed five percent thereon. It is clear to me that the rules which apply to an ordinary broker or real estate agent are not applicable to an indivisible contract of this kind. I think, also, that it ought to be held, both as a conclusion of law and as an inference of fact, that in January, 1902, Standring did have actual authority to sell the land at a fair profit and a fair price, and that the contract entered into with the defendants was strictly within such authority.

Some point is made in another branch of the argument on the form of the contract entered into with defendants. It is said that he did not purport to act as agent, but that he sold in his own name. It will be noted that he did not agree to execute a deed for it, but agreed to "furnish" one. This point is not important at this stage.

When an agent has actual authority to enter into a contract, it is immaterial whether he purports to act as the agent of a disclosed principal or whether he purports to act in his own name and to conceal his principal. The undisclosed principal is nevertheless bound. See *Young v. Inman*, 146 Iowa, 492; *Steel v. Potthast*, 109 Iowa, 413, and the cases therein cited.

That Standring had authority to collect the price in advance of the execution of the deed by plaintiff is indicated by the conduct of the parties in relation to the sale, as reported by Standring in January, 1903. He represented to plaintiff, a collection of $2,500 of the price long before the deed was executed and before any name of purchaser was reported. His authority to do so was in no manner questioned. On the contrary, it was taken for granted by both parties.

The order requiring the plaintiff to pay to defendants $1,782 is based upon the finding that such money represents the purchase price paid by the defendants to Standring and remitted by Standring to plaintiff. If the plaintiff received the defendants' money as a part of the purchase price of the land, then he was chargeable with knowledge of its source. His retention of the purchase money under such circumstances was a ratification of the act of his agent in selling the land, even though he did not know just what his agent had done. It was so held in *Russ v. Hansen*, 119 Iowa, 375. It is urged that this doctrine is not applicable, because Standring made the contract in his own name. This is precisely what was done by the fraudulent agent in the *Russ* case, *supra*. It is urged also by the plaintiff that the defendants have not proved that the money received by him was the money which they paid to plaintiff. The identity of money for the purposes of equity is not a matter of specific coins or bills. The identity of funds rests largely in the intent of the parties remitting the same. In this case the defend-

ants did pay to Standring the "purchase money." They were the only purchasers of the land. One year later the plaintiff was advised by Standring that the land was sold, although he was deceived both as to the time and the terms of sale. He was not advised at that time of the name of the purchaser. Before any misrepresentation had been made to plaintiff as to the name of the purchaser, and while the defendants were in possession of the land as the only purchaser, Standring remitted to plaintiff two installments, which purported to be a part of the purchase price received by him from the purchaser. These installments were knowingly received by plaintiff *as purchase money.* This was sufficient *prima facie* proof of the identity of the funds. This proof is not negatived by other testimony. The case in this respect is therefore fairly ruled by the *Russ* case *supra.* I do not overlook the fact that plaintiff makes a qualified tender of this money to the defendants. The tender is coupled with a denial of all liability in that regard. He offers to pay the amount only if he *must.* He had litigated the point at every step, and has appealed from the order of the trial court requiring such payment. I do not think his tender is such as to avoid the rule adopted in the *Russ* case, *supra.* The point is close here as it was there. Following that case, the plaintiff is precluded from questioning the validity of the contract under which the money received by him was received by his agent.

For the reasons set forth, I think the contract entered into between Standring and the defendants was valid. If valid, it is enforceable now. I think the defendants are entitled to this relief.