T. D. McCarney, Appellee, v. D. S. Lightner, Appellant.

**APPEAL AND ERROR:** Intermediate Orders (?) or Final Judg-
1 ment (?)  A litigant is not *compelled* to appeal from inter-
locutory orders.  He may save his exceptions, and await the
*final* judgment, and appeal therefrom, and *then* have a review
of every adverse, interlocutory order leading up to the final
judgment.

**APPEAL AND ERROR:** Calendar Entry (?) or Final Judgment (?)
2 An appeal taken within the statutory time after the judgment
is entered in the *record* is timely, irrespective of the date of
the *calendar* entry.

**PARTNERSHIP:** Profits and Losses—Land Deal.  Two parties are
3 not *partners*, as between themselves, when one party is obli-
gated to bear *all* the expense and *all* the losses, while
the other party is to have half the ultimate *profits*.  So held in
a land deal, wherein the profit-sharing beneficiary was denied
a partnership accounting.

**BROKERS:** Principal and Agent (?) or Partners (?)  An agree-
4 ment under which one party to a land deal furnished *all* the
money and bore *all* the expense, and the other party was to
have half the ultimate *profits*, does not constitute the profit-
sharing beneficiary a *partner*.

**BROKERS:** Profits as Commission—Termination of Contract.  Where
5 a broker was to have a commission, measured by half the prof-
its realized on a retransfer of the land, and the land was trans-
ferred at a *loss*, held, on a detailed review of the evidence, that
the parties understood that the agent's right to profits termi-
nated at least as early as the first transfer, and was not kept
alive as to later trades.

**CONTRACTS:** Performance—Failure to Fix Time.  Principle rec-
6 ognized that, in the absence of a contract time for performance,
the law will imply a reasonable time.

*Appeal from Greene District Court.*—E. G. Albert, Judge.

JANUARY 20, 1920.

REHEARING DENIED MAY 11, 1920.

Suit in equity for an accounting under an alleged partnership. The fact of partnership was specially denied by the defendant. There was also a general denial of all liability. There was a decree finding the existence of a partnership between plaintiff and defendant, and adjudging the defendant liable to the plaintiff under an accounting thereunder for a large amount. The defendant appeals.—*Reversed.*

*Church & McCully* and *Clark, Byers & Hutchinson,* for appellant.

*A. D. Howard* and *E. G. Graham,* for appellee.

Evans, J.—By his petition, the plaintiff claimed that, in August, 1912, he and defendant entered into an agreement of partnership, for the purpose of purchasing a certain quarter section of land in Dallas County and reselling same at a profit; that, pursuant thereto, they did purchase the same; that the defendant was to furnish all the purchase money, and did so furnish the same, and the title was taken in his name; that, subsequently, he traded the land to Stout, and traded the Stout land to Roper, and sold the Roper land to Vogel. The plaintiff claims that all these lands belonged to the partnership. The defendant denies generally all these allegations, and avers the facts to be that he did, in August, 1912, agree with the plaintiff that he would buy the certain quarter section of land which was for sale, subject to a future settlement on March 1st, and that, if the plaintiff, who was a land agent, could sell the same before settlement day, he should receive half the profits, and that, if he failed to do so, he was to procure for defendant a

loan of $10,000 upon the property, at 5 per cent interest, without commission; that the property was purchased, pursuant to such agreement, and that the plaintiff failed to sell the same, and failed to procure a loan thereon at settlement time, without commission; that, one year after the defendant acquired such farm, he traded the same at a loss; and that the agreement between the parties had been terminated long before, or, at least, was terminated at the time of and by such trade.

The plaintiff was a land agent, and justice of the peace in his township. The defendant was a farmer and a stock shipper. The parties lived in the same township, four miles apart. As land agent, the plaintiff had, sometime previous, sold a farm to the defendant. As justice of the peace he had a continuous business for him, in looking after and collecting from the railroad company for overcharges and losses in shipment of stock. The quarter section involved belonged to the four heirs of the Simpson estate, one of whom was the wife of the defendant. The defendant had been the administrator of such estate, and, as such, had listed the land with the plaintiff for sale. The heirs had agreed upon a price of $90, but no purchaser at that price had been found. Thereafter, the defendant's wife instituted a partition suit, wherein a referee was appointed, who advertised the place for sale. A purchaser was finally found by the referee, one Thompson, who was willing to buy at the price. Thereupon, the defendant, through McCarney, raised the bid, and brought on some counter bidding by Thompson. The final result was that the defendant's bid, through McCarney, $14,750, was accepted as the highest bid. This was in August, 1912. The substance of the plaintiff's direct testimony was as follows:

"After I had received this offer for $115 per acre, Dave came into my office,—that is, D. S. Lightner,—and says, 'Let's buy the farm.' The answer I made,—this was before

the partition suit,—that was before he was to get a referee appointed,—I says, 'Dave, I have no money to buy the farm.' 'Well,' he says, 'The devil. I will furnish the money, and we will divide the profits.' I says, 'If you will do that, I am willing to go in.' He says, 'We might as well have the profits as those girls;' that they would spend it anyhow. He says, 'Tom, I don't want them to know that I have anything to do with the farm. You go ahead and buy the farm, and I will furnish the money, and we will divide the profits, and they won't know anything about it,' and I did. After the referee was appointed, he says to me, 'I don't believe I will have anything to do with it.' I says, 'If you don't want anything to do with it, it is too good a deal to let go,' and I says, 'If you don't want to go into the deal, Dan O'Donnell, cashier of the Savings Bank, says he will furnish the money;' and he said, 'Don't do anything now;' and in a few days, he came in, and says, 'You go ahead and buy it, and I will furnish the money.' "

On cross-examination, he testified as follows:

"A. It was that he was to furnish the money to buy it with, and I was to place a loan for $10,000, and he was to furnish the balance of the money, and we were to split half and half, taking out all of the expenses. There was no time set when this partnership should stop. I was to furnish the loan of $10,000, if we got it. I says, 'I am quite sure, Dave, I can get $10,000.' * * * I was to pay interest on half that he would pay in. I would pay interest on half, and him pay interest on half. I was to pay interest on the money he should furnish, half of the money that I should furnish from the loan, and Mr. Lightner half the interest. In other words, all of the interest was to be taken out of the proceeds of the rentals of the farm, the taxes, insurance, and interest, and he was to keep track of it. I was to buy the farm in my name,—not in his name. The interest and the taxes and insurance was to be paid out of the profits, and if

there were any profits, he was to take them out of the profits when we settled. * * * If *there were no profits, he was to put up the money; I wasn't to put up any money. He was to put up the money.* We discussed that before I bought the farm. * * * Of course we bought it for speculation. I bought the farm with the express purpose of selling it. Some day after that, when we sold it, we were to divide the profits, after taking out the expenses. After I failed to make the loan, I expected Lightner to pay the expense. If I got the loan, there was to be no commission. I expected to pay the commission *out of my share of the profits.* I told Lightner, I says, 'If I can't get a loan, and you have to get it, it *will come out of the profits.*' I said, 'If I fail to make the loan, and we had to make it through someone else, that whatever was paid out there *was to come out of my share of the profits.*' Lightner was to take care of all expenses. He was to pay the interest. On this commission on the loan that I couldn't make, and that I was having to pay commission on, Lightner was to pay that, and I was to pay him back *out of the profits.* That was my obligation in reference to that matter, that he was to take it *out of my share of profits.* The agreement was with regard to this one particular farm, the Simpson farm, this one particular piece of land."

Re-direct:

"In reference to my testimony that the agreement related to this one particular piece of land, I meant the amount of money that was involved in it. If we traded for another piece of land, it was to be handled in the same way. That agreement was to be continued until we closed up. No, the commission on the loan, if I couldn't make it myself, and we had to make it through some other agency, I was to pay the commission on the loan."

On recross-examination, McCarney testified as follows:

"I claimed that the Dallas County land was my land.

I did not tell anybody that it was Lightner's land.   I told them that that was my land."

The substance of the testimony of the defendant on the main issue was as follows:

"I recall Mr. Referee giving notice of this sale.   I don't think he set a time for bids.   After Joy was appointed referee, I met Mr. McCarney at his office.   He wanted to know why I didn't buy the land.   I told him it wasn't the kind of land that I would like, and another thing, I didn't have the money to handle this land; that it must be all cash, and that I couldn't handle it; that there was nothing against the farm, and that I couldn't handle it.   At the first conversation, I don't know what he said; he talked to me several times about this land, and kept telling me that the land was worth the money.   The land had been priced at the time at $90, and he said the land was worth a lot more than that, and that he could sell the land for $115 or $125 per acre, in a reasonable time.   I told him that I didn't think it was worth that money,—that I didn't believe he could get that much; and he kept telling me it was; and finally he says, 'I can get a loan of $10,000 on that land;' and I told him, I says, 'I don't believe you can get that much money on it.'   'Yes,' he says, 'I am a loan agent, and I know that I can;' and finally I made him a proposition. I told him that I would buy the land, provided I could buy it around $90, if he could get a loan of $10,000, or even $9,000; that I could handle it, if he could get that much money.   I told him that I would buy the land, and, if he could sell the land before settlement day, the 1st of March, that I would give him half the profits on the land, and if he did not sell it, he was to furnish me a loan of $9,000 or $10,000 at 5 per cent interest, and not charge me any commission for getting it.   He said he would do that. * * * My proposition was that he was to dispose of it before the 1st of March following the time that he purchased it, and

he could have half of the profits. It was my intention to absolutely dispose of it before the 1st day of March. I don't know that it had to be sold, but that was the talk about it * * * If it wasn't sold, I could take it over and settle for it. We had that agreement, McCarney wasn't to get a cent for it if he did not sell it before the 1st of March. He wasn't to charge me anything for getting the loan of $9,000 if he didn't sell the farm before settlement time."

Much of the corroborating evidence offered by both parties is not very significant. As against the plaintiff, evidence that, in his attempt to negotiate a sale, he referred to the land as Lightner's, or evidence in his favor that he used the plural pronoun, and referred to the land as "ours," is not persuasive in either direction. Either form of speech might be deemed consistent with the customary methods of agents, while representing their principals.

It will be seen from the foregoing that the issue of fact between the two parties as witnesses is quite definite. The plaintiff contends that a partnership was formed, and that the land belonged to the partnership, and one half thereof to him, as one of the partners; whereas, the defendant claims that they had a simple agreement, whereby the plaintiff, as a land agent, should receive half the profits as his commission, in the event of sale before settlement day, March 1st. The vital question in the case is, Was there a partnership? Before proceeding to a discussion of the evidence as bearing on that question, we should deal with a preliminary motion filed by the appellee for a dismissal of a branch of this appeal.

I. At the trial below, when the plaintiff rested, the court directed that he would hear the evidence first on the question of the existence of a partnership, and that

he would decide that question before the labor of an accounting should be undertaken. Over some objection by the defendant, this was the course appropriately adopted by the trial court. This issue was submitted, and the cause continued in other respects. Thereafter, in November, 1917, the trial court entered upon its calendar a general finding that the equities were with the plaintiff. Later, on January 26, 1918, this calendar entry was entered upon the journal, and included in the record signed on that date by the judge. Pursuant to the November finding of the trial court, an accounting was had, and a final judgment was rendered against the defendant. Appeal was taken from the final judgment within six months, and within six months from January 26, 1918. The motion is to dismiss the appeal as to the finding of partnership. The ground thereof is that the appeal was not taken within six months from November 20, 1917, the date of the calendar entry.

1. APPEAL AND ERROR: intermediate orders (?) or final judgment (?)

The order of November 20th was not a final judgment. Assuming, without deciding, that it was such an interlocutory order from which appeal could have been taken, under the statute, no appeal was taken. While our statute permits appeal in cases from certain intermediate orders before final judgment, we have always held that the litigant is not compelled to appeal before final judgment, in order to save his right of review. He may save his exceptions, and await the final judgment and appeal therefrom, and may thereby obtain a review of all rulings properly excepted to which lead up to the judgment. *Jones v. Chicago & N. W. R. Co.*, 36 Iowa 68; *Miller v. Kramer*, 148 Iowa 460; *Lesure Lumber Co. v. Mutual Fire Ins. Co.*, 101 Iowa 514; *Mueller Lumber Co. v. McCaffrey*, 141 Iowa 730, 735. To the foregoing it may be added that the entry upon the calendar of November 20th was not a judgment from

2. APPEAL AND ERROR: calendar entry (?) or final judgment (?)

which appeal could have been taken. Only the journal entry could be deemed such judgment. An appeal within six months from January 26th, therefore, would have been in time, even if it had been necessary to take the same within six months from the entry of the order.

II.  Does the record herein disclose a partnership? The averment of partnership of two parties may be established as to third parties by circumstances and inferences fairly warranted by the attitude of the alleged partners toward the public. In other words, they may be found to be partners as to third parties, though they were not, in fact, such as between themselves. When, however, the question is an issue between the alleged partners themselves, one affirming and the other denying, the court must ascertain the terms of the very agreement entered into, as a matter of fact, and the effect of such agreement as a matter of law, in order to determine whether it constitutes a partnership.

3. PARTNERSHIP: profits and losses: land deal.

The essential requisites to constitute a partnership are few and definite. One of these is that the agreement entered into must contemplate a sharing of both profits and losses. There are many relations out of which agreements for a sharing of profits may arise, which are not deemed partnerships. Persons may be associated as joint owners of real estate, and may co-operate in realizing profits therefrom, and yet not be partners. Such a case was *Munson v. Sears*, 12 Iowa 172. To quote from the opinion in that case:

"A partnership agreement is, where two or more persons join together their money, goods, labor, and skill, or either or all of them, for the purpose of advancing a fair trade, and of dividing the profits and losses arising, proportionably or otherwise, between them. * * * Partnership is a contract of two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in

lawful commerce or business, and to divide the profits and bear the losses in certain proportions. * * * To constitute a partnership in a particular purchase, or in a single transaction, there must be an agreement to share in the profit and loss. In this contract, it was agreed to share ultimately any profit and loss. There was no investment of a partnership fund; no agreement that any business should be carried on in a firm name. The parties had no previous partnership or connection with each other in trade; and no intendment can be made in favor of a partnership, so as to supply the absence of fact."

Persons may be the joint owners of personal property, and may co-operate in the use of the same, and realize joint profits therefrom, and yet not be partners. Such was the case of *Iliff v. Brazill*, 27 Iowa 131, the parties thereto being joint owners and operators of a threshing machine.

An agreement for a share in the profits of a business or transaction, as compensation for services to be rendered, does not constitute a partnership. Such were the cases of *Holbrook & Bro. v. Oberne, McDaniel & Co.*, 56 Iowa 324; *Winter v. Pipher & Co.*, 96 Iowa 17; *Porter v. Curtis, Morris & Diver*, 96 Iowa 539; *McBride v. Ricketts*, 98 Iowa 539; *Haswell v. Standring*, 152 Iowa 291; *Goss v. Smith*, 178 Iowa 348. In *Haswell v. Standring*, 152 Iowa 291, a case was presented wherein the facts and circumstances supporting the claim of partnership were overwhelmingly greater than is found in the case at bar. But we held that there was no partnership. That was a case, too, where the claim of partnership was put forward by third parties, who had been misled and defrauded by an assumption of authority on the part of one of the alleged partners. That case also involved the purchase and sale of real estate, for the purpose of speculation, wherein one furnished the money and took the title, and wherein the other did the entire business of purchasing, renting, and selling. The

title holder was a nonresident, and had never seen the land in question, and had never exercised any judgment or discretion of any kind as to the purchase or the sale thereof, but had left the matter solely to the purchasing agent, who was to receive half the profits. We held the case to involve only an agreement for a sharing of profits.

To quote from the opinion therein:

"Under the rule in this state, the mere showing of profits does not create a partnership. An essential element of the relation is the obligation to share losses, also. * * *. It is not necessary that there be an express agreement to share the losses of the venture. Such an agreement may be inferred from other provisions of the contract, 'the nature of the business, and the relation of the parties to the business to be transacted.' * * * The contract between the plaintiff and Standring was that the latter should buy land for the plaintiff, guarantee the plaintiff interest on the money he so invested, and have one half of the net profit when the land was sold. In this case, the evidence shows that the annual rent from the land about paid the plaintiff 6 per cent interest on his original investment, and the taxes on the land; so that Standring was entitled, under the contract, to one half of the amount it sold for above the original price. There is nothing in the contract, or in the nature of the particular transaction, tending even to show an agreement to share losses."

In *Goss v. Smith*, 178 Iowa 348, there was a written contract for a division of profits between the title holder of the land and the land agent who was instrumental in the acquisition of the land by the landowner. Prior to the litigation, the agent claimed an interest in the land as a partner, but such claim was not put forward for him by his counsel in the litigation. The facts of the case, however, illustrate the natural tendency to claim an interest in land as a partner by a profit-sharing beneficiary.

Appellee places special reliance upon *Richards v. Grinnell,* 63 Iowa 44. The cited case furnishes no real aid to the plaintiff. The case was tried on a demurrer to a petition. The petition alleged a partnership, but did not allege specifically that there was an agreement for sharing profits and losses. All that this court held was that the averments of the petition, being taken as true, were sufficient averments of partnership. The obligation to share losses would be implied. There is no holding that the averments of the petition could have been sufficiently proved, without showing an agreement which, either expressly or impliedly, provided for the sharing of losses.

In the case at bar, we have the evidence of each party, and his version of the agreement. The testimony of the plaintiff himself is definite and emphatic, that he was "not to put up any money." Whatever was to be charged against him was to be taken *out of his profits.* As far as he was concerned, only profits were contemplated. If there had been no profits, there would have been nothing against which loss could be charged as to him. Accepting this fact as testified to by him, it would have been a complete defense to any claim against him by Lightner for a contribution in the payment of losses. The case is, therefore, readily classified as an agreement for a share of the profits, as compensation for his services as agent in the purchase and proposed sale of the property. There was no partnership, in a legal sense, as between the parties. No equities of third parties are involved. If there was no partnership, then plaintiff had no interest in the land as such. The claim of partnership constitutes his only avoidance of the statute of frauds. The defendant held his title to the land by warranty deed from the plaintiff. He paid all the purchase money, the plaintiff paying no part thereof. There was, therefore, no resulting trust. In the absence of part-

4. BROKERS: principal and agent (?) or partners (?)

nership, therefore, the defendant's title is absolute and unimpeachable. In so far, therefore, as the oral evidence introduced by plaintiff tends to impress a trust in his favor upon the real estate, it must all be disregarded as incompetent, under the statute.

III. It remains to consider whether anything can be found for plaintiff upon his prayer for general relief under the qualified agreement for a sharing of profits, as admitted by the defendant. In passing upon that question, it is doubtful whether we can consider any other evidence than that of defendant. The testimony of the plaintiff is so interwoven with incompetent evidence, introduced for the purpose of showing an interest in the land, that it is difficult, if not impossible, to pick therefrom any competent evidence conflicting with that of the defendant.

5. BROKERS: profits as commission: termination of contract.

The evidence for the defendant is that the profit-sharing agreement contemplated only a case of sale of the property on or before settlement day, March 1st, and while the contract of purchase and equitable title was in the name of McCarney; that the scheme failed, in that they were unable to sell by such time, either with or without a profit; and that the profit-sharing enterprise was terminated by the transfer of the property from McCarney to Lightner, and the payment by Lightner of the full purchase price. Assuming that this position of the defendant is contradicted by competent evidence of the plaintiff that the enterprise was to continue and apply to successive transactions, we proceed to consider the corroborations of the respective contentions to be found in the circumstances surrounding the parties, and in their mutual conduct. In weighing the testimony, the plaintiff starts at a disadvantage. His testimony on that question is in the form of conclusion. The actual conversation testified to by him does not support it.

The conclusion is the natural product of the claim of partnership. If there was a partnership which was the real purchaser of the Dallas County land, then the trading of that land for other land by the partners would make the partnership the beneficiary of such trade, and the real owner of the property acquired in the trade; and this would be true successively for any number of trades into which the partnership property might be put. This was doubtless the theory upon which the trial court proceeded. When it had once found the fact of partnership in plaintiff's favor, the rest followed logically, as a matter of law.

Having found the fact of partnership against the plaintiff, we cannot project the profit-sharing scheme into other trades and transactions, as a mere legal consequence. We can only do so if we find that such was the actual agreement of the parties.

The land was bought from the referee by the bid of McCarney, in his own name. The contract of sale was entered into in the name of McCarney. A down payment of $500 was made. This was paid by Lightner. That the parties expected to turn the property before settlement day is quite clear, under the evidence. McCarney, as a land agent, repeatedly assured Lightner that he could quickly find a purchaser at an advance in price. He was more confident of a quick sale than was Lightner, and he urged the purchase for that reason. He had something to gain by the enterprise, and nothing to lose. Lightner was, doubtless, no less keen for the gain than was McCarney. His desire for gain, however, was sobered by the possibility that a purchaser might not be found, and that he might have to pay, on settlement day, for a property which he did not want, the quality of the land being unsatisfactory to him. It was to allay this fear that McCarney agreed to procure for Lightner a $10,000 loan upon the property at 5 per cent, without commission, if he failed to make a sale. In no event was McCarney to

receive a commission. If he sold the land, he was to receive half the profits, in lieu of commission. If he failed to sell the land, he was to procure for Lightner a 5 per cent loan of $10,000, without commission. Efforts were made forthwith by McCarney to find a purchaser, and these were continued down to settlement day. On March 1st, all efforts had failed. By an agreement with the referee, settlement day was postponed until March 10th. On that date, the enterprise still remained *in statu quo*. Thereupon, McCarney executed to Lightner a warranty deed of the property. Lightner paid the full amount of the purchase price. McCarney failed to procure the $10,000 loan. Lightner, however, negotiated a 5 per cent loan for $9,000 through other agents, and paid a commission of $100. McCarney was instrumental, in some degree, in procuring the $9,000 loan. The execution of the warranty deed by McCarney, following his failure to make a sale or to procure a loan without commission, is a circumstance of some importance. Did this settlement and conveyance terminate the profit-sharing enterprise? Nothing further was said on the subject between the parties. Subsequent events cast some light upon the question. After obtaining the title, Lightner took full charge of the land. He insured the buildings and rented and collected rents. No account was ever taken of these items, as between him and McCarney. McCarney was still in business as a land agent, and appears to have continued, for a time, his efforts at producing a buyer. In December, 1913, he was instrumental in producing Stout, a proposed trader for the land. Stout had a farm of 120 acres in Calhoun County. A trade resulted. Stout was, to all appearances, represented by Pittman and Sandy, and Lightner by McCarney. In the resulting contract of exchange, Lightner took a secondhand automobile, at a price of $1,300; paid $1,100 of boot money; and paid a commission, either to or through McCarney, for $275.

The evidence shows that this trade resulted in a net loss to Lightner of not less than $300. Upon the consummation of this trade, there was no claim of profit by McCarney, nor offer to pay loss, nor was there any offer to pay any part of the boot money, or to take any interest in the automobile; nor was there any demand by Lightner upon McCarney for any of these things. Lightner expended $100 in repairs upon the automobile, and then sold it for $800. There was no consultation of any kind between him and McCarney on the subject. McCarney testified that he got none of the commission, but that it all went to the agents of Stout. The check for commission was signed by Lightner, but drawn by McCarney. No reason appears in the record why Lightner should pay the agents of Stout, or why his check should go to them, except upon the theory that the agents for the two parties had pooled their commissions. There is no doubt, upon this record, but that Lightner believed that McCarney got his share of the commission, and that McCarney knew that Lightner so believed. Nor are we convinced that McCarney did not get a share of this commission. Unless he got the same, there was no occasion for Lightner's paying a commission at all. If they were still operating under the profit-sharing scheme, then it was McCarney's part to accomplish the sale without a commission. If they were not operating under the original scheme, then Lightner would be liable for a commission. McCarney's explanation is that he was standing this commission himself: that is to say, it was to be charged against his share of the profits. But there were no profits; and, if there had been, not the slightest attempt was made by McCarney to ascertain the amount thereof. But we proceed. The plaintiff pleaded in his petition that, after the acquisition of the Stout tract, the defendant ignored him, and failed to consult him. Lightner assumed full control of the Stout land; he expended moneys in making improv-

ments thereon; he rented and collected the rents; within a year or two, he traded this land to Roper. In the same manner, he took full charge of the Roper land. It must needs be rented, and terms of renting agreed on; improvements were made; insurance was carried; taxes were paid; clover and timothy seed was purchased; during a part of the time, the farm was rented for shares; the shares had to be received and marketed. All these matters were of vital interest to McCarney, if they were to enter into a computation of his profits. He had also the duty of sharing the burden of looking after these things, if he was to receive the compensation of profit sharing. In order to make the Roper trade, large boot money was paid. An agent's commission of $250 was paid. This was the method whereby the defendant "ignored" the plaintiff. There was no friction between the parties in regard to it. They saw each other frequently, and transacted other business with each other continuously. It is undisputed that, from the time of the Stout trade, and for a period of three years, McCarney did not interest himself at all in the management of either the Stout or the Roper farm. He made no inquiry about any of these matters enumerated, nor did he tender any assistance thereon. The significance of this conduct cannot be ignored. It was consistent with the conduct of Lightner. Their mutual conduct indicated the same understanding: that McCarney had no interest in the Stout or the Roper transaction.

The only possible question of fact open to debate is whether the profit-sharing enterprise terminated at the time of the settlement with the referee, and the execution of the deed from McCarney to Lightner, or whether it was continued to December, 1913, when the Stout trade was made. In view of the absence of profit in the Stout trade, the question is not a material one. We may say, however, that, in view of the payment of a commission by Lightner in the Stout trade, either to or through McCarney, and of

the fact that he traded at a loss the land that he did not wish to keep, and that there was never any consultation between him and McCarney as to the fruits of that trade, though their personal and business relations were undisturbed by any friction, we are satisfied that they both deemed the profit-sharing scheme to be terminated at the March settlement with the referee.

The profits sued for by the plaintiff were made by Lightner long subsequent to December, 1913, and arose out of phenomenal rise of land values, which occurred in the following years. McCarney contributed neither money nor labor nor counsel to any transaction out of which the profits were made. His claim rests, not upon any equity or *quantum meruit*, but upon the actual terms of the oral contract of August, 1912. A very careful study of this record satisfies us that the contract, in its subject-matter, was confined to the Dallas County land, and that the successive transactions subsequently had, did not at that time enter at all into the contemplation of the parties. Such contract cannot, therefore, be projected into them now.

If there was no express agreement as to the time of accomplishing the sale of the Dallas County land by McCarney as agent, then the law will imply that it must be done within a reasonable time. *Goss v. Smith,* 178 Iowa 348. Such a profit-sharing contract will not give to the selling agent a perpetual grip upon the property of his principal. He cannot bide his time indefinitely, and wait for rising values to give him large profits upon the sole investments of his principal. Under the operation of this rule, a reasonable time for the performance of this contract had elapsed long prior to the accrual of any profits to anybody.

6. CONTRACTS: performance: failure to fix time.

We reach the conclusion that the contract pleaded by plaintiff is not proved, and that there is no equity in his bill.

The decree entered in his favor must, therefore, be reversed, and a decree entered here, dismissing his petition.— *Reversed.*

WEAVER, C. J., LADD, PRESTON, and SALINGER, JJ., concur.