C. F. KINNEY et al., Appellants, v. BANK OF PLYMOUTH et al., Appellees; R. E. JOHNSON, Treasurer of State, et al., Appellants.

No. 39970.

APRIL 10, 1931.

REHEARING DENIED OCTOBER 31, 1931.

Blythe, Markley, Rule & Clough, for C. F. Kinney et al., and for Adolph Anders Estate, Wm. F. Borchardt, Admr., et al., appellants.

John Fletcher, Attorney-general, and Maxwell O'Brien, Assistant Attorney-general, for R. E. Johnson, Treasurer of State, appellant.

Marty & Butler, for Consolidated Independent School District of Plymouth, appellant.

Fitzpatrick & Barlow, for Cerro Gordo Chapter of the American Red Cross, appellant.

L. T. Bosworth, for Anna Bliem et al., appellants.

Senneff, Bliss, Witwer & Senneff and E. C. Moody, for Oscar Fields et al., appellees.

Garfield E. Breese, E. W. Schilling and Wm. H. Salisbury, for G. O. Heinselman et al., appellees.

Smith & Feeney, for Receiver of Bank of Plymouth et al., appellees.

FAVILLE, C. J.—Plymouth is a town of about 300 inhabitants, situated in Cerro Gordo County. For nearly twenty years prior to the matters involved in this case a private bank had been conducted in said town under the name and style of the Bank of Plymouth. The owners of said bank were F. G. Ehlers and R. Valentine, and said parties had the sum of $5000 invested as capital in said enterprise. Valentine appears to have been a silent partner and to have had no active part in the management of the affairs of the bank. Ehlers and his son had charge of the bank.

In the year 1918 a new bank was organized in said town and duly incorporated under the laws of this state. About said time Ehlers conceived the idea of reorganizing the Bank of Plymouth as a corporation and securing a number of the customers of said bank as stockholders in said contemplated corporation. Ehlers secured the services of a party to solicit subscriptions to stock in said proposed corporation. The subscription was as follows:

"We, the undersigned, agree to take the number of shares set opposite our names provided at least 25 to 30 good representative farmers tributary to the vicinity of Plymouth take enough shares to amount to $4,500.00, the capital stock to be $10,000.00."

Each of the appellees subscribed in the amount of $100 except two; one of whom subscribed for $200 and the other for $300.

On or about December 18, 1918, Ehlers sent to each of the subscribers a letter as follows:

"Your subscription for the amount of stock that you subscribed for in the reorganization of the Bank of Plymouth may be paid on or before January 1st, 1919, upon which date your subscription will be credited and share in the profits of the ensuing year. Yours truly, F. G. Ehlers."

The amounts subscribed for were paid into the bank before January 1, 1919, by the several appellees. The record tends to show that when the subscriptions were paid in to the bank, the amount so paid was carried in a deposit account for a considerable length of time, and was later transferred to a capital account. There was no meeting of the subscribers. There was no execution of any articles of incorporation. There was no change in the name of the institution. It continued to operate exactly as it had always done before.

There is evidence tending to show that in the early part of 1918, Ehlers made application to the State Department of Banking for the necessary blanks for the incorporation of a bank under the laws of this state, but nothing further was done in regard to said matter, nor does it appear that either appellants or appellees knew of this. There is evidence also tending to show that most of the appellees lived in or near the town of Plymouth and did banking business with said bank prior to their subscriptions, and continued so to do thereafter until the closing of the bank.

About a year or so after the appellees had paid their subscriptions into said bank the cashier of said bank procured a printed form of certificate, which was sent to each of said appellees. Said certificate is as follows:

"Number                                         Shares

                         ✳✳✳✳✳✳                         -

"Bank of Plymouth
"Plymouth, Iowa.
"Authorized Capital Stock, $10,000.00

"This certifies that..........................................................................is the
owner of..............................................................shares of the Capital
Stock of

BANK OF PLYMOUTH

transferable only on the books of this corporation in person or
by attorney upon surrender of this Certificate properly endorsed.

"In witness thereof, the said Corporation has caused this
certificate to be signed by its duly authorized officers and its
corporate seal to be hereunto affixed at Plymouth, Iowa, this
.............day of...................................................A. D. 1918.

"Bank of Plymouth      R. Valentine          F. G. Ehlers,
"seal                         President.              Cashier.
"Plymouth, Iowa                    Shares $100 each."

On the back of said certificate appeared the following:

"CERTIFICATE
for

----------------

shares
of the
Capital Stock
of
Bank of Plymouth
Plymouth, Iowa.

Issued to

------------------------------------

Date...................................1919

"For value received,.....................................hereby sell,
assign and transfer unto.....................................................................
shares of the Capital Stock represented by the within Certificate,
and do hereby irrevocably constitute and appoint............................
attorney to transfer the said stock on the books of the within
named Corporation with full power of substitution in the prem-
ises.

"Dated..................................................

"In presence of

--------------------------------------------------  --------------------------------------------------

"Notice. The signature of this assignment must correspond with the name as written upon the face of the certificate, in every particular, without alteration or enlargement, or any change whatever."

The appellees received and retained these certificates.

Beginning with January, 1920, the bank delivered annual dividends to each of said appellees as follows:

"In  January 1920   15%
  "   January 1921   15%
  "   January 1922   15%
  "   January 1923   12%
  "   January 1924   12%
  "   January 1925   10%

The bank closed in November, 1925.

The evidence also shows that the appellees owned shares of stock in other corporations and participated as stockholders in annual meetings of other corporations.

The appellants are depositors in said bank and are seeking by this action to hold the appellees personally liable to the appellants for the amounts of their deposits, which were made after the said subscriptions of the appellees were taken and paid for. There is no evidence in the record to the effect that the appellants knew of the transactions herein referred to, or that appellants made any deposits in said bank relying upon the relationship of the appellees to said bank; nor is there any claim that appellees ever held themselves out to any of the appellants or to the public as being in any way connected with said bank.

The foregoing is a general outline of the facts in the case, sufficient for a consideration of the legal propositions involved.

I. Code Section 8362 is, in part, as follows:

"A failure to substantially comply with the foregoing requirements in relation to organization and publicity shall render the individual property of the stockholders liable for the corporate debts."

In Schumacher v. Sumner Telephone Co., 161 Iowa 326, we considered this section and held that the statute was in the

nature of a penalty for failure by incorporators or persons attempting to act in a corporate capacity to comply with the conditions of the statute. We said:

"If there was no attempt to incorporate and the company was assuming no corporate functions or powers, the essential conditions of a statutory liability are lacking."

There is no claim in the instant case that the Bank of Plymouth ever attempted to act as a corporation or held itself out to the appellants or the public as a corporation. This statute has no application to the facts of this case. This is not a case, for example, where a notice of incorporation is fatally defective, or where articles of incorporation are not legally executed. In this case there was no attempt at incorporation, and no act or thing done by the bank *as a corporation,* or by appellees as incorporators of a corporation.

As bearing on the question, see Adler v. Baker-Dodge Theatre Co., 190 Iowa 970; Heuer & Brockschmidt v. Carmichael, 82 Iowa 288; Union Trust & Savings Bank v. Blair-Harper Seed Co., 200 Iowa 374.

II. Under the stated facts, what then was the relationship of the appellees to the Bank of Plymouth, and to the appellants as creditors of said bank?

We first consider whether or not the appellees were partners in said bank by contract, and liable to appellants as such. Partnership is generally a matter of contract between the parties forming the partnership. Did the arrangement which the parties entered into make the appellees partners in said bank as a matter of contract? As in all contracts, the question of intent is proper to be considered in construing a contract of partnership. It must be held, under the record in this case, that the appellees had no intention of entering into a contract of partnership in the private Bank of Plymouth. They subscribed for shares of stock in a contemplated corporation. They were notified that their "subscription for *stock*" "in the *reorganization* of the bank" should be paid by January 1, 1919. Their intention obviously was to become stockholders in a corporation which was to be subsequently formed by Ehlers, but there was no intention to enter into any contract of partnership in the private bank. Appellees had no intention of acquiring any interest in

the private bank and their contract gave them no such interest. It is clear that there was no express contract by which appellees were made partners in the private bank.

III. In this connection, the record shows that after the bank closed there was found therein a certain exhibit which is as follows:

"Plymouth, Iowa, February 21, 1918. I, F. G. Ehlers, agree that if at least twenty-five or more good representative farmers living in the territory tributary to the town of Plymouth, Iowa. * * * I agree to reorganize the Bank of Plymouth making the capital stock $10,000.00. If at the end of one year the shares do not pay at least 8%, I agree to buy them back at their face values plus 8%.

"F. G. Ehlers, Cashier."

Some question is raised as to whether or not the contents of this exhibit were ever made known to the appellees. Neither it nor a copy thereof was delivered to appellees. There is some evidence that some of the appellees were told that Ehlers would guarantee eight per cent on the subscriptions or he would return the money and eight per cent thereon. But in any event, this agreement, if it be deemed to have been such, was all predicated on the organization of a new bank in which appellees were to be shareholders and in which "the shares" were to "pay at least 8%." There is nothing in this agreement, even if it became effective, that entitled the appellees to participate in the profits of the private bank. If effective at all·it had to do solely with the contemplated organization of the corporate bank, not to profits in the private bank if a corporation was not organized.

We fail to find in the record any agreement that constituted a partnership.

IV. But even though the parties do not by express terms enter into a contract to form a partnership, still, in a proper case, such a contract may be implied from the acts and conduct of the parties and all the facts and circumstances of the case. It is strongly urged that the appellees, for six years, participated in the profits of said private bank and shared in dividends therein, and that by reason thereof they are bound as partners to pay the losses.

At the outset it is to be noted that not only was there no

agreement to form a partnership, but there was no agreement to share in the profits of the private bank. The owners of the private bank did not agree to pay the appellees profits the private bank might earn. The appellees had no legal or equitable claim on any profits that the private bank earned. If we assume that the "dividends" which were paid to the appellees were, in fact, paid out of the profits of the private bank, then the vital question is: does such participation in profits, without any purpose, intention, or agreement to form a partnership, under circumstances such as are disclosed in this record, make appellees liable as partners for losses? In other words, does the law, under such circumstances, create a partnership, even though the parties never intended to form a partnership? This is the very crux of this case.

It was early laid down as a rule that participation in profits "as profits" made one a partner and liable as such for losses. The parent cases announcing such a doctrine were Grace v. Smith, 2 Wm. Blackstone 998, decided in 1775, and Waugh v. Carver, 2 H. Blackstone 235, decided in 1793. In the former case the court said:

"Every man who has a share of the profits of a trade ought also to bear his share of the loss."

The same rule was announced in the Waugh case.

The question again came up in the English Court in 1860, in the case of Cox v. Hickman, 8 House of Lords Cases *268. The best discussion is found in the opinion of Lord Cranworth, in which he said:

"'* * * it was argued that as they would be interested in the profits, therefore they would be partners. But this is a fallacy. It is often said that the test, or one of the tests, whether a person not ostensibly a partner, is nevertheless, in contemplation of law, a partner, is, whether he is entitled to participate in the profits. This, no doubt, is, in general, a sufficiently accurate test; for a right to participate in profits affords cogent, often conclusive evidence, that the trade in which the profits have been made was carried on in part for or on behalf of the person setting up such a claim. But the real ground of the liability is, that the trade has been carried on by persons acting on his behalf. When that is the case, he is liable to the trade obligations,

and entitled to its profits, or to a share of them. It is not strictly correct to say that his right to share in the profits makes him liable for the debts of the trade.''

The American authorities are divided along the two lines indicated by the English decisions. The early English rule appears to be followed in New York and Pennsylvania. Leggett v. Hyde, 58 N. Y. 272, 17 Am. Rep. 244; Wessels & Co. v. Weiss, 166 Pa. 490, 31 Atl. 247.

The leading American decision following the rule of Cox v. Hickman is Beecher v. Bush, 45 Mich. 188, 7 N. W. 785. After an exhaustive review of the authorities, that eminent jurist, Justice Cooley, said:

''It is needless to cite other cases. They cannot all be reconciled, but enough are cited to show that in so far as the notion ever took hold of the judicial mind that the question of partnership or no partnership was to be settled by arbitrary tests it was erroneous and mischievous, and the proper corrective has been applied. Except when one allows the public or individual dealers to be deceived by the appearances of partnership when none exists, he is never to be charged as a partner unless by contract and with intent he has formed a relation in which the elements of partnership are to be found. And what are these? At the very least the following: Community of interest in some lawful commerce or business, for the conduct of which the parties are mutually principals of and agents for each other, with general powers within the scope of the business, which powers however by agreement between the parties themselves may be restricted at option, to the extent even of making one the sole agent of the others and of the business.''

To the same general effect and as sustaining said rule, see, Harvey v. Childs, 28 Oh. St. 319, 22 Am. Rep. 387; Clifton v. Howard, 89 Mo. 192, 1 S. W. 26; Sutton v. Schaff, 104 Kan. 282, 178 Pac. 418; Meehan v. Valentine, 145 U. S. 611, 36 L. Ed. 835; Parchen v. Anderson, 5 Mont. 438, 5 Pac. 588; Sodiker v. Applegate, 24 W. Va. 411, 49 Am. Rep. 252; Waggoner v. First National Bank, 43 Neb. 84, 61 N. W. 112; Boston and Colorado Smelting Co. v. Smith, 13 R. I. 27, 43 Am. Rep. 3.

The late Professor Floyd R. Mechem, in his recent work on the Elements of Partnership, p. 89, Sec. 98, says:

"It is entirely clear that the old rule that sharing profits as profits made one a partner is overthrown."

So much for the authorities generally. We now revert to consideration of a few of our own decisions.

In Ruddick v. Otis & Snow, 33 Iowa 402, we said:

"For the protection of third persons a partnership will often be implied, when none in fact will be held to exist as between the parties themselves. Price & Co. v. Alexander & Co., 2 G. Greene, 427, and cases cited. No doctrine of the law is better settled than that a mere participation in the profits does not constitute a partnership in respect to the concern or adventure from which the profits arise."

In Johnson Bros. v. Carter & Co., 120 Iowa 355, we said:

"From these authorities may be deducted, as established in this state, the following principles: (1) That the agreement only to share profits will not constitute partnership, though evidence of existence of that relation. (2) The sharing of losses is essential in a partnership, though the undertaking to do so may be inferred from an agreement to divide profits, unless precluded by the terms thereof. (3) That payment for services, or for the use of money or property to be used in the business, may consist of a share of profits, without making of the loaner or employe a partner."

In Haswell v. Standring, 152 Iowa 291, we said:

"Under the rule in this state, the mere * * * (sharing) of profits does not create a partnership. An essential element of the relation is the obligation to share losses also. Winter v. Pipher, 96 Iowa 17; Johnson Bros. v. Carter & Co., 120 Iowa 355. It is not necessary that there be an express agreement to share the losses of the venture. Such an agreement may be inferred from other provisions of the contract, 'the nature of the business, and the relation of the parties to the business to be transacted.'"

In Malvern National Bank v. Halliday, 195 Iowa 734, we said:

"This court is committed to the doctrine that a sharing of

profits alone is not enough to predicate a partnership. Haswell v. Standring, 152 Iowa 291 (Ann. Cas. 1913 B. 1326 and note). It is not necessary that an express agreement exists that each party shall bear a share of the losses which may occur, but it must be said under the agreement and as a legal consequence thereof that one participating in the profits must be liable for a share of the losses.''

In the case of Seacord v. Pendleton, 55 Hun (N. Y.) 579, the court considered a situation very similar to that presented in the instant case. In said action there was a bank operating under the name of the Home Savings Bank. The defendants were subscribers to stock in said bank. The bank was never legally incorporated, although, as in the case at bar, so-called certificates of stock were issued to and held by the defendants in the action and it also appeared, as in the case at bar, that the defendants shared in the profits of said bank from dividends paid from time to time upon their so-called shares of stock. The plaintiffs being depositors in said bank sued the defendants as such ''stockholders'' to recover their deposits. The court said:

''We do not think the allegation in the complaint that the defendants shared in the profits of said bank, by the receipt of dividends paid from time to time upon their respective shares of stock, establishes a liability on the part of the defendants as copartners for acts performed by others without their consent. It did not, we think, amount to a ratification of such acts. * * * Nor do we think that the judgment can be sustained on the ground that the defendants were members of a joint-stock association, and, as such, liable to the plaintiff. We think the allegations of the complaint were insufficient to constitute a cause of action against the defendants as members of such an association, constituted either by agreement, implication of law or otherwise.

''If the complaint in this action had alleged that the defendants had acted or were instrumental in organizing such bank by the election of a president, cashier or board of directors, or that they had taken any part in such proceedings, or in any business transacted by such bank, either as principals, partners, agents, directors or otherwise, or that any articles of association, or incorporation or partnership had existed between or been

278

signed by them, or that there was any agreement between the defendants under which such business was carried on, the rule applicable to the case might have been different, but as the complaint contains no such allegations, we think it was insufficient. These considerations lead us to the conclusion that the Special Term erred in overruling the defendants' demurrers.''

So in the case at bar there is no showing in the record that the appellees ever intended to have any interest in the private Bank of Plymouth. They were not instrumental in organizing or carrying on said bank. They took no part in its proceedings or in any business transacted by it in any way. No articles of incorporation or partnership were ever executed by any of them, and there was no agreement among them under which the business of the private bank was to be carried on. The fact that they received the so-called shares of stock and dividends is not sufficient to render them liable to the appellants. They never intended to acquire an interest in the private Bank of Plymouth. They subscribed for stock in a contemplated corporation which they expected would be formed.

In this discussion it has been assumed throughout that the dividends paid to the appellees were, in fact, ''profits'' of the business of the private Bank of Plymouth. The record, however, does not clearly show that the dividends that were paid to the appellees were, in fact, genuine profits earned by said Bank of Plymouth. Rather, it is a reasonable inference that they represented interest which Ehlers saw fit to pay to the appellees upon their subscriptions.

On this branch of the case we reach the conclusion that there was no sufficient showing to render the appellees liable for the losses that the appellants incurred by reason of their deposits in said bank.

V. A party may be bound as a partner by estoppel as to third persons where there has been a holding out of such partnership, or an ostensible partnership, as it is sometimes termed. Under the record in this case there is no proof of partnership by estoppel. There was no holding out by the appellees that they were partners in said bank or had any interest therein. Appellants had no knowledge whatever of the subscriptions of appellees and their payments to the bank until after the bank closed. They, of course, placed no reliance upon the relation-

ship of appellees to the bank, having no knowledge or information regarding such relationship when dealing with the bank.

There could be no finding of an ostensible partnership, or a so-called "partnership by estoppel" under the record in this case.

VI. Appellants seek to hold appellees on the theory that they were engaged in a joint adventure. In a general way the rules as to a partnership pertain as to a joint adventure. Tusant & Son Co. v. Weitz, 195 Iowa 1386. As applied to the facts of this case there was no proof of a joint enterprise such as would make appellees liable to appellants.

The arguments have taken a wide range. In behalf of all parties they are very exhaustive and have been very helpful to us. We have not attempted to discuss each and every detailed proposition that has been presented, but all of them have been considered.

We reach the conclusion that under no theory presented are the appellees liable to the appellants for the amount of the latter's deposits in the Bank of Plymouth.

The decree of the trial court is—Affirmed.

EVANS, STEVENS, MORLING, KINDIG, ALBERT, WAGNER, and GRIMM, JJ., concur.